2015 IL App (1st) 120654

No. 1-12-0654

Filed September 24, 2015

FOURTH DIVISION

IN THE APPELLATE COURT

OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 07 CR 8683 |
| | ) | |
| WILLIS REESE, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Gordon concurred in the judgment and opinion.
Justice Palmer specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Following trial, a jury found defendant, Willis Reese, guilty of aggravated vehicular

hijacking, vehicular invasion, attempted armed robbery, and escape. The trial court subsequently

sentenced him to concurrent extended-term sentences of, respectively, 50, 30, 30, and 14 years in

prison, to be served consecutively to the natural life sentence defendant was serving on a prior

murder conviction. Defendant appeals, arguing (1) the State failed to prove him guilty of

aggravated vehicular hijacking, as it failed to show that he dispossessed the victim of the bus, (2) the State failed to prove him guilty of vehicular invasion, as it failed to show he used force to enter the bus, (3) a fatal variance existed between his attempted armed robbery indictment and conviction, (4) he was deprived of due process when he was shackled during jury selection without the trial court articulating the reasons for his shackling, (5) the State introduced excessive and irrelevant details regarding his prior murder conviction, (6) the trial court failed to comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), thereby rendering his waiver of counsel invalid, (7) the court erroneously imposed extended-term sentences on offenses that were not among the most serious class of felony, and (8) his convictions for both aggravated vehicular hijacking and vehicular invasion violate the one-act, one-crime doctrine.

¶ 2    For the following reasons, we reverse defendant's conviction and sentence for aggravated vehicular hijacking, and affirm his convictions for vehicular invasion, attempted armed robbery, and escape. We affirm defendant's 30-year sentences for vehicular invasion and attempted armed robbery, and reduce his sentence for escape to 7 years.

¶ 3                                    I. BACKGROUND

¶ 4    On March 19, 2007, a jury found defendant guilty of first-degree murder. Three days later, before he was sentenced for that offense, defendant was taken to an appointment at Stroger Hospital (Stroger). Following his appointment, defendant went into a restroom, removed a shank he had hidden in his shoe, and fled the building, injuring several people during his escape. Based on the events that transpired that day, the grand jury returned an indictment charging defendant with, among other offenses, aggravated vehicular hijacking, vehicular invasion, attempted armed robbery, escape, disarming a peace officer, and aggravated kidnapping. The indictment also

charged him with multiple counts of attempted first-degree murder, which the State later nol-prossed.

¶ 5                              A. Pretrial Proceedings

¶ 6     The public defender was appointed to represent defendant, and, in October 2008, defendant told the trial court that he wished to "exercise [his] constitutional right" to proceed *pro se*. He expressed dissatisfaction with the public defender's office and stated he was making his "decision knowingly and intelligently." The court advised defendant that two of his attempted first-degree murder counts alone carried 20- to 80-year prison sentences and possible extended-term sentences of 40 to 160 years' imprisonment. The court stated, "Basically, you are looking at massive time if you are convicted." Defendant indicated that he understood. The court then advised defendant of the normal and extended-term sentences that Class 1, Class 2, Class 3, and Class X felonies carried. When asked whether he understood the penalties and sentencing ranges, defendant responded, "Perfectly, Your Honor, perfectly." The court did not admonish defendant that any possible sentence in his case would run consecutively to the sentence he was serving on his murder conviction. After completing its admonishments, the court permitted the public defender to withdraw.

¶ 7                       B. Jury Selection and The State's Motions *In Limine*

¶ 8     In November 2011, the parties appeared before the trial court for jury selection. Defendant indicated he was "ready to change into [his] clothes and get out of [his] shackles" so he could "prepare [his] paper work." The court started to explain the *voir dire* procedure, and defendant stated, "I mean I would like to write this stuff down. This is just not good right now. I want to write what you're saying down. So if you would say it again later on that would be fine, too." The court told defendant that "[l]ater on," his hands would be free and both tables would be

covered with drapery so that the jurors would not be able to see defendant's leg shackles. The following exchange then occurred.

"THE DEFENDANT: But won't they be able to hear?

THE COURT: I guess if you move your legs around a lot.

THE DEFENDANT: Yeah. And I am a human being so that's a big possibility that would happen. Also—I mean the shackles why do they need to stay on at this particular portion of trial?

THE COURT: I will leave it at their discretion. I am not going to order them to take—

THE DEFENDANT: They take them off with other people. I've shown you approximately a year and a half ago that I can handle myself without being shackled when I argued the motion between [the assistant State's Attorneys]. I didn't have shackles then.

THE COURT: You are preaching to the choir. All you have to do is talk to the men in charge. If you can convince those three men that you don't need leg shackles, you don't have to have them on.

THE DEFENDANT: My point is I didn't have to convince them the first time you did it. But it's fine. We can do it that way this time."

¶ 9    After the trial court further explained *voir dire* to defendant and a recess took place, defendant again brought up his shackles. The following exchange took place.

"THE DEFENDANT: Judge, one thing before we get started, and I don't mean to bring this back up and be difficult. But it's a very big problem. Will this

be the case these shackles. When the jury come[s] in here, when trial officially starts, will I still be confined to this?

THE COURT: That's up to the Illinois Department of Corrections.

THE DEFENDANT: Judge, the Illinois Department of Corrections is not on trial. You see what I am saying. They're not on trial. Their constitutional rights are not being violated. And so they could care less. They have a system that they run down there. The only way they are going to come off is by court order."

Defendant told the court, "I will give you my word if I so much as step in the wrong direction, I will willingly put these back on. But I am here to do a thorough job, and I can not work under these conditions." The court indicated it would take the matter under consideration and make a decision the next day.

¶ 10    Later, jury selection commenced. The first panel of six potential jurors consisted of Tiffany Fourkas, Danielle Quinn, Alvin Hunt, Aaron Perry, Quinn McSorley, and Melissa Myles.[1] When asked whether he accepted the panel of Fourkas, Quinn, Perry, and McSorley, defendant stated, "No, I don't accept three individuals." The court asked defendant who he would not accept, and he indicated Fourkas. He then asked if the trial court could "possibly have him dismissed for a moment" because an "issue" was "going on" and he did not think the court "would want" the jurors to hear about it. The court asked whether defendant was only dismissing Fourkas, and defendant stated "Here's the thing, sir. Our reason for having these drapes here, what was our reason for having these drapes?" After the court dismissed the prospective jurors, defendant explained that Fourkas, McSorley, and Myles were "all sitting on this side here. And if

---

[1] The State excused Hunt, who said he had just gotten off of probation and was "kind of on the fence" about his ability to be fair.

you notice this little area right here is completely open. And it basically defeats the purpose of you having this drape up on the table. They saw me with the shackles on. If they saw me with the shackles on, then we might as well not have the drapes up." The court asked defendant which people saw the shackles, and defendant stated Fourkas and McSorley.

¶ 11    The trial court asked that Fourkas and McSorley be brought back into the courtroom separately. Upon questioning, Forukas said she could not see behind the drapes. Nonetheless, defendant exercised a peremptory challenge to remove Fourkas.

¶ 12    The trial court then questioned McSorley, who indicated he could see behind the drapery and saw "a little belt on [defendant]'s strap between his feet." He denied that what he saw would affect his ability to be fair. Defendant then asked the following questions, and McSorley provided the following responses.

"Q. Does this [the shackles] mean anything of significance to you?

A. No.

Q. Not at all. Does it give you the impression that I can not control myself?

A. No, not at all.

Q. Are you sure about that?

A. Yes.

Q. So when you see a man with shackles on his feet, what do you think. Tell me the first thing that came to your mind.

A. What?

Q. Tell me the first thing that came to your mind when you saw these shackles on my ankles?

A. I knew you were being supervised by these two patrol men.

Q. That's a problem in itself. Okay. I won't strike."

The other members of the panel returned to the courtroom, and the court asked whether anything about defendant's appearance would affect their ability to be fair. The court explained that it was referring to "[h]is appearance with this drapery in front of him." Quinn stated, "No I guess" and asked whether there was "something we should know that we don't know because now I am confused." The court said there was nothing the jury should know. The record does not contain a response from any of the other potential jurors. The parties accepted the panel of Myles, Perry, Quinn, and McSorley.

¶ 13    At the conclusion of *voir dire*, the trial court addressed the State's motions to introduce defendant's prior murder conviction. The State sought to use the conviction as evidence of defendant's motive to escape as well as for impeachment purposes. The State also filed a motion *in limine* to present a certified copy of the charging instrument from defendant's prior murder conviction. The State explained that it wanted to "prove up that defendant was convicted three days before the incident and to introduce evidence of the potential sentence he was facing in so far as it relates to motive." The trial court ruled that the State could not present that information in its case-in-chief but could use defendant's prior conviction for impeachment if defendant testified. The court instructed defendant as follows. "[S]hould you testify and testify in a way that that could be used to impeach you, then of course I will allow the State to introduce that certified copy of conviction, cross examine you on the fact that you were convicted of murder. You knew you were facing a heavy sentence, et cetera, as a motive to escape." The court also ruled that, with respect to the escape count, the State could say only that defendant "was in custody on felony charges." Before the proceedings ended, defendant asked the court if it would "please remember to consider the shackle situation" for trial. The court asked the Department of

Corrections (DOC) officer about the shackles, who responded, "We keep them on unless you order them off." The court then stated as follows. "I am inclined to let him have—to be taken off when he—people usually like to stand when they give their argument and move around a little bit. So I'll sign that order tomorrow and you can take the shackles off. And he will have a little more freedom."

¶ 14                                  C. Trial

¶ 15    On the first day of trial, the trial court ordered that defendant's shackles be removed during trial. Thereafter, the parties presented the following evidence.

¶ 16    Cook County sheriff's officer Vito Zaccaro testified that he was working in the external operations unit at Stroger at around 1 p.m. on March 22, 2007. Zaccaro met and received defendant at the front of the hospital. Defendant was an inmate at the Cook County jail and was wearing a DOC uniform, handcuffs, and leg shackles. Zaccaro transported defendant to the dermatology clinic on the second floor of the hospital.

¶ 17    During his 10- or 15-minute appointment, defendant repeatedly asked to use the restroom. When his appointment finished, Zaccaro took defendant to a single-occupancy restroom in a hallway, removing his handcuffs but not his shackles. Zaccaro then waited outside the restroom, leaving the door "open about a crack" so that he could see defendant. After about 10 minutes, Zaccaro heard a toilet flush. When defendant came out of the restroom, Zaccaro told him to put his hands out so that he could place him back in handcuffs. Defendant jumped to the side with a silver metal weapon, held the weapon to Zaccaro's neck, and said, "Move or I'll cut you." Zaccaro then felt defendant's "hand going down the right side" of Zaccaro's body as though he was reaching for Zaccaro's gun. Zaccaro threw his arms up to prevent defendant from taking

the gun, and defendant stabbed him in the neck. Zaccaro tripped over defendant's shackles, and they both fell to the ground.

¶ 18    Defendant got up and started to run away. Zaccaro hit the "panic button" on his radio to signal an emergency and started to pursue defendant through the "maze" of hallways. As defendant ran, he continued to swing the weapon in his hand. Eventually, he ran through an emergency stairwell and exited the hospital. Zaccaro followed and observed defendant run onto a shuttle bus. When Zaccaro attempted to enter the bus, "the door slammed" on him. The bus proceeded around the circular driveway, made an "unusual maneuver, and "just kind of stopped and went into a wall." A door opened and defendant exited the bus, at which point Zaccaro believed that hospital police officers tackled him to the ground.

¶ 19    On cross-examination, defendant asked Zaccaro if he had handcuff keys on his belt, and Zaccaro responded that he did. Zaccaro also acknowledged that defendant never made a verbal demand for Zaccaro's weapon.

¶ 20    Victoria Hill, a nurse at Stroger, testified that she was treating a patient named James Holman at around 1:45 p.m. on March 22. As she was treating Holman, Hill heard "bumping" outside of the examination room. She opened the door and saw defendant and a sheriff in the restroom across the hallway, struggling with each other. The sheriff had a gun in his holster and appeared to be trying to hold defendant from "getting his gun or something or getting away." Hill started screaming and ran to the nursing station down the hall. After calling the police, Hill waited at the nursing station and saw defendant run past her out the door. Hill started running behind the sheriff who was chasing defendant, yelling "Stop him, stop him." Hill's coworker, Nestor Francia, tried to stop defendant. Hill proceeded down the stairwell and observed defendant exit the building and run to a shuttle bus.

¶ 21    Nestor Francia testified that while he was assisting a patient in the dermatology clinic, he heard Victoria Hill saying, "don't let him get away." Francia then observed a man in a "scrub" uniform and shackles running toward the door. Francia chased the man and attempted to grab him by his pants. The man then turned around to face Francia, swung his hand, and stabbed Francia in the left arm near his wrist bone. Afterward, the man continued running away and Francia returned to the clinic area. Francia was unable to identify defendant at trial, but he agreed that he had identified a photograph of defendant on March 26, 2007.

¶ 22    James Holman testified that he was receiving treatment from Hill at the Stroger dermatology clinic when he heard "some knocking and banging" outside the room. Afterward, he heard a male's voice yelling for help. Hill opened the door and said, "oh, my God, help, help, help." Holman looked out the door and saw defendant and a police officer fighting near the bathroom across the hall. The inmate was trying to grab whatever the police officer was protecting on his right side. Holman ran into defendant and the officer to break up their fight, knocking defendant toward the bathroom sink and knocking the officer into the hallway wall. Defendant hit Holman in the face and eye, and Holman felt "metal." Holman continued approaching defendant, but eventually defendant "took off," running down the hallway in the opposite direction of the officer, who was getting up from the ground. The officer followed defendant, and Holman lost sight of him. Holman sustained three stab wounds and underwent surgery for an injury involving his eye.

¶ 23    On cross-examination, Holman acknowledged that he did not see defendant going for the officer's weapon. Defendant asked whether it was possible that he "was going for something to take off the shackles?" Holman responded, "No," explaining it looked as if defendant were "forcefully taking something."

¶ 24    James Rimmer was driving a shuttle bus between Stroger and a nearby parking lot. He was waiting in the driver's seat of the bus, with the doors open, outside one of the main hospital entrances at around 1:45 p.m. on March 22. An inmate in a jail uniform, whose face Rimmer was not able to clearly see, entered the bus, held his right hand in front of Rimmer, and said, "Drive. If you stop, I'm gonna stab you in the neck." Rimmer could see an object in the inmate's hand. Rimmer closed the door, put the bus in drive, and attempted to drive out of the lot.

¶ 25    However, a car was blocking the parking lot entrance. Rimmer got the idea to reach over to a lever which opened the bus door, because he knew that doing so would cause the brakes to "lock up." He testified that "if you're standing up and I throw my door open, you automatically go forward, so it [gave] me a chance to get out of the situation I was in." Rimmer opened the door, the inmate "went forward," and Rimmer grabbed the inmate's right arm. The two started wrestling, and the inmate stabbed Rimmer twice on the left side of his face and once in the chest. Rimmer acknowledged that the inmate's did not touch him until Rimmer grabbed him, and that the inmate never got behind the wheel of the bus. Rimmer testified that the "whole struggle" lasted about 10 or 15 seconds, and then the inmate broke free and ran out the bus door. He ran about five or six feet away before a security guard tackled him.

¶ 26    Sharon Jambrosek testified that she was sitting on the shuttle bus in the seat behind the shuttle bus driver when an inmate entered and told the bus driver to "drive, mother f***, drive." The bus driver started to drive before stopping quickly behind a parked car. The inmate made a forward motion with his fist and appeared to be stabbing the driver. Jambrosek went toward the back of the bus for her safety, and did not remember much from that point on. She did not see the bus driver and the inmate "rassling" or the inmate exiting the bus. Jambrosek also acknowledged that she never saw the inmate's face.

¶ 27     Sergeant Gregory Hardin, an investigator at the Cook County Hospital, testified that he was working on the first floor of Stroger when he received a call over his radio that an escaped prisoner was running down the stairwell from the second floor. Hardin and two or three other officers ran outside, where people directed him toward the shuttle bus, which was driving around the cul-de-sac area. Hardin and the other officers ran toward the bus. After the bus stopped, Hardin saw defendant raising his hand in a fist, striking the bus driver. Hardin ran to the front door of the bus but could not open it, so he ran to the back door and eventually was able to enter. Defendant turned around and came toward him, making a forward thrusting motion with his right hand. Hardin ordered him to stop and get down, and defendant started walking toward the front of the bus. Additional officers entered the bus, removed defendant, put him on the ground, and placed him in handcuffs.

¶ 28     Sergeant William Villasana of the John Stroger Hospital Police Department testified that he learned via his police radio of a "scuffle" involving a corrections officer. Villasana ran to the second floor, where people directed him to the stairs. He proceeded outside the main entrance and saw a police officer lying on the ground. When he reached the bus, he entered through the back door and saw the bus driver, who was bleeding from the neck. He then exited the bus. By the time he reached the inmate, other officers had already apprehended him. Villasana could not identify defendant in court but knew the person that was apprehended was wearing a DOC uniform. After bringing the inmate inside, Villasana went back outside near the bus and found a shank or piece of steel wrapped with cloth.[2]

---

[2] Forensic testing of the metal item that was recovered, as well as Zaccaro's firearm, revealed no fingerprints suitable for comparison. Deoxyribonucleic acid (DNA) testing indicated defendant could not be excluded as the source of the mixture of DNA profiles found on the shank's cloth.

¶ 29 Joe Dugandzic, an investigator with the Cook County sheriff's police department, testified that on March 22, he was assigned to investigate an attempted escape at Stroger Hospital. He later met defendant at the jail. He initially testified that he did not speak to defendant. However, Dugandzic later testified that before the grand jury, upon being asked whether defendant voluntarily told him anything, Dugandzic responded, "At first, no, and then a couple of minutes later he stated I had to do what I had to do. If somebody got hurt, oh well. He said I wanted out and if anything got in my way, I would have done whatever it took." Defendant did not make his statements during a formal interview.

¶ 30 Following the conclusion of the State's case-in-chief, defendant made a motion for directed finding in which he admitted he "was trying to escape" but asserted the State had failed to prove the charges of vehicular hijacking, vehicular invasion, attempted armed robbery, or disarming a peace officer. The court denied defendant's motion.

¶ 31 Before defendant testified, the trial court admonished him outside of the presence of the jury that if he chose to testify, he would be cross-examined by the State, who could use his 2007 murder conviction against him to impeach his credibility. The court further explained that the State in rebuttal would be able to introduce the certified copy of defendant's conviction. Defendant asked, "how far does that play out?" The court responded that the State would not be able to talk about the facts of the conviction and would only be able to "read in [defendant] on or about, so and so was convicted of the offense of first degree murder." The State indicated that depending on the justification or defense that defendant set forth while testifying, it might ask the court to revisit its earlier motion seeking to introduce the potential sentence defendant faced, insofar as it related to his motive to escape. The court stated that if defendant testified regarding

a "necessity" defense, the State would be able to cross-examine him and rebut his motive with his murder case.

¶ 32    Defendant chose to testify on his own behalf. During his testimony, he stated as follows.

"Now, when it comes to, because I know you guys want to know, you know, have I been convicted? Yes. What was I convicted for? Murder, 4 years ago. Did I do it? Honestly not from the bottom of my heart with everything in me no, I did not. Am I in jail for it? Yes, I am. And as you guys know, there's many people down in prison that says this, you know, but all I have is my word up here. I've sworn to be honest with you guys. That's all I have. I done [*sic*] have anything else. And I did not take the life of anyone, including the person that I'm in prison for right now. And I'm still in the process of clearing my name.

Now when it comes to how I ended up being in prison, it's a long story but, I'll modify it by saying I was very young, extremely young. I was a kid 17 years old. I was manipulated by officers and through that manipulation put me in a position to be further taken down the line of going to prison.

When it comes to what I learned out of this situation, I learned you should never be so naïve as to trust a person because they wear a badge. It's that simple. And another thing I learned from that situation that's why I was trying to stress so hard earlier that I would never speak to anyone without an attorney present from that very experience. I'm traumatized. You can't get too close to me and try to ask me too many questions without me saying, I plead the 5th or I need an attorney from that very experience.

Now when it comes to whether or not I was an inmate in the Cook County Jail at the time of the escape, yes that's true I was. Had I spent a great deal of time in the Cook County Jail awaiting trial; yes, I had, 4 and a half years to be exact."

¶ 33    Defendant then went on to detail the "appalling" and "terrible" conditions in jail, explaining that he did not "trust anybody in the system." He chose to remain in prison to wait for his trial, believing "they would see [his] innocence." In 2005, a correctional officer kicked and punched him. When defendant retaliated, other officers responded, jumping on defendant and badly injuring his eye and causing bruises to his face and cuts where his handcuffs were. Defendant remained in the hospital for three days. Although he knew he was likely to be beaten again, he nonetheless returned to jail. Upon his return, he did not immediately attempt to escape. However, after "going to trial and being found guilty," defendant realized he was "going to be one of these guys who sits in prison for 30 years, you know, on something that he didn't do."

¶ 34    On March 22, defendant went to the hospital to have a mole checked on his leg. He carried a knife in his shoe and pretended he had to use the restroom as "a ploy." When defendant went into the restroom, Officer Zaccaro closed the door and sat down to read a newspaper. Defendant then tried to remove his shackles with the knife but failed. At that point, defendant decided he would have to take Zaccaro's keys to undo his shackles.

¶ 35    Defendant exited the restroom and when Zaccaro started to put defendant's handcuffs back on, defendant "grabbed him" and told Zaccaro to give him his keys. Zaccaro refused, so defendant tried to take them from their location on Zaccaro's belt. Defendant explained that he only wanted Zaccaro's keys and not his gun. Defendant wanted to escape because he felt his life was in danger and if he escaped, he could alert the authorities and help others who were "falling victim to mistreatment in the Cook County Jail for years."

¶ 36    As defendant ran through the hallways, Nestor approached him. Defendant held out his knife because he wanted Nestor "to stay at bay." Nestor then walked toward defendant and "side swipe[d]" defendant's hand, causing his own injury. When defendant reached the outside of the hospital, he entered the bus through the open door and told the driver something to the effect of, "[P]lease driver I'm in trouble I'll explain everything to you later." Rimmer agreed and started to drive. When the bus pulled up behind the stopped car, defendant saw all of the officers approaching and "knew the gig [*sic*] was up." He asked Rimmer to open the door and turned to exit the bus. Rimmer then jumped up and grabbed him. During their fight, defendant "accidentally hit" Rimmer with the knife. After his encounter with Rimmer, defendant surrendered peacefully to the police. Defendant reiterated that he did not belong in prison and that he feared if he stayed any longer, he would "come up dead" like the people he knew who had been beaten by officers or other inmates. He wanted to escape so that he could contact the appropriate authorities and encourage them to investigate the corruption in the jail.

¶ 37    On cross-examination, defendant acknowledged that he tried to escape but did so because he was attacked and was warned he would be attacked again. The State asked defendant whether the purported beating by the officers took place on December 14, 2005, while defendant was in jail "[o]n the charges, among other things of first degree murder." Defendant responded affirmatively. The State entered photographs of defendant's injuries into evidence, and they were shown to the jury.

¶ 38    Defendant acknowledged that a jury found him guilty of first-degree murder on March 19, 2007. The State asked whether the jury made an additional finding that, in committing the murder, defendant personally discharged a firearm that proximately caused the victim to die. Defendant responded, "Oh, yeah. And when they did that, when they did that, sir." The State

asked, "Is that what they found?" and defendant responded, "Not that I know of" and that he "thought it was something different than that." The State continued by asking, "Oh, well as a result of those findings, [defendant], after being found guilty of first degree murder three days before your escape and with the additional finding that you shot your victim to death, you were looking at a potential sentence of 45 years to the rest of natural life in prison?" Defendant objected, and the trial court overruled his objection. Defendant then agreed that he was found guilty of a crime, which he "did not commit."

¶ 39     The State said, "Okay. You were found guilty of a crime of first degree murder and the jury found that you committed that murder by shooting and killing your victim?" Defendant responded, "Well, the jury found that—found at that time that I was found guilty, yes or no, [defendant], is that what—I'm not sure I know they found me guilty on a murder, sir. I don't remember all of that." The State then asked, "And after your findings, after the conviction, you understood that your potential sentence was 45 years to the rest of your life, somewhere in that range?" Defendant acknowledged that he knew the sentence he was facing; however, it "didn't mean anything" to him because he "thought [he] wasn't going to stay in there." Defendant maintained that his motive for escaping was his fear that he would be beaten again, not the prospect of spending 45 years in prison. Later, the State again asked defendant whether, on the date of his escape, he was in prison for being "charged with a felony murder among other things?" Defendant responded, "I was charged with murder." The State then asked, "In fact, as of March 22, 2007, you had been convicted and were awaiting sentencing on the murder charges?" to which defendant responded, "Yes, I was in there."

¶ 40     According to defendant, Rimmer attacked him on the bus because the bus was surrounded by police and Rimmer realized his act of driving defendant may have looked like he

was aiding and abetting an escaped prisoner. He denied that when he stood next to Rimmer with the knife in his hand he was attempting to force Rimmer to drive the bus. He explained he was holding the knife "in the first place" because he wanted to use it to remove his shackles.

¶ 41     In rebuttal, the State offered into evidence a certified statement of conviction and disposition, stating "that the defendant was found guilty by a verdict of guilty on the charge of first degree murder on March 19, 2007." The trial court admitted the document into evidence, indicating it would give the jury "a limiting instruction at the end of the argument with respect to that."

¶ 42     The case proceeded to closing arguments. During his closing, defendant argued that he was reaching for the officer's keys, not his gun. He further argued that he chose to escape for many reasons, but the "main" reason was that he was "beaten, savagely beaten and hospitalized." He chose to remain in prison following the beating because he wanted to "do it the right way" and wait for his trial. He asserted that, "[t]hose are the facts, not that I just woke up one day and said you know what, the hell with this place, I'm out of here."

¶ 43     In rebuttal, the State challenged defendant's argument that he wanted to escape so that he could expose the purported inhumane treatment of jail inmates. The State asserted as follows.

> "It's not a coincidence that the escape attempt of March 22nd, 2007, comes 3 days on the heels of the guilty verdicts on a charge of first degree murder. On the verdict, the additional verdict that the murder was committed by personally discharging a firearm that resulted in death of the victim.
>
> It's not a coincidence that based upon those findings, that he's realizing he's looking at somewhere between 45 years and the rest of his life in prison.

You want to know where why he's looking to escape? Nothing to do with the guards in the jail, nothing to do with the way people are treated, got nothing to do with the food or the noises in the middle of the night. It's about not going to prison for at least 45 years. It's about establishing his freedom."

¶ 44     Following instructions, the jury retired to deliberate. In discussing which evidence to give to the jury, the State commented as follows. "I believe we were going to send back all our exhibits except for the Grand Jury transcript and the certified copy." The trial court responded, "Right. The Grand Jury transcript doesn't go back, everything else does."

¶ 45     During deliberations, the jury sent the trial court multiple notes, including one that asked "Is it attempted robbery on one specific item or anything at all? Example: Pen, badge, socks, shoes… Anything or one item?" Defendant suggested that the jury be informed the language in the indictment controlled. He pointed out that the indictment specified he committed attempt armed robbery by trying to reach for Zaccaro's gun. Thus, defendant said he thought "that's all they should be worried about." The court responded that the armed robbery instruction correctly stated the jury could find he reached for any property. The court explained to defendant that an indictment was not meant to be taken literally and was only meant to inform a defendant of the charges he faced. The court further explained that an indictment could always be conformed to the proof at trial if the proof turned out to be "slightly different" than what was alleged. Defendant responded that he "had a misconception about how this goes" but the judge had cleared up his misconception. The court responded to the jury, "Your instructions contain the definition of armed robbery. Reread the instruction. This instruction does not make reference to a specific piece of property and includes any property of the victim."

¶ 46    The jury found defendant guilty of aggravated vehicular hijacking, unlawful vehicular invasion, escape, and attempt armed robbery. It found him not guilty of disarming a peace officer, and it could not reach a verdict as to aggravated kidnapping. The court declared a mistrial on the aggravated kidnapping count

¶ 47                    D. Posttrial Proceedings and Sentencing

¶ 48    Defendant accepted the appointment of the public defender for posttrial matters. Counsel filed a motion for new trial on defendant's behalf. At a hearing on the motion, counsel argued, among other things, that defendant was severely prejudiced at the beginning of *voir dire* by being shackled. In denying defendant's motion, the trial court noted that defendant drew attention to his shackles, the table was protected with drapery, and the juror who saw the shackles already believed defendant was a security risk based on the guards around him. At a later hearing, the trial court imposed concurrent extended-term prison sentences of 14 years for aggravated escape, 30 years for attempted armed robbery, 30 years for vehicular invasion, and 50 years for aggravated vehicular hijacking. The court ordered the sentences to run consecutive to the natural life sentence defendant was serving for murder. This appeal followed.

¶ 49                    II. ANALYSIS

¶ 50    On appeal, defendant argues (1) the State failed to prove him guilty of aggravated vehicular hijacking, because it failed to show he dispossessed the victim of the bus, (2) the State failed to prove him guilty of vehicular invasion, because it failed to show he used force to enter the bus, (3) a fatal variance existed between his attempted armed robbery indictment and conviction, (4) he was deprived of due process when he was shackled during jury selection without the trial court articulating the reasons for his shackling, (5) the State introduced excessive and irrelevant details regarding his prior murder conviction, (6) the trial court failed to

comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), thereby rendering his waiver of counsel invalid, (7) the court erroneously imposed extended-term sentences on offenses that were not among the most serious class of felony, and (8) his convictions for both aggravated vehicular hijacking and vehicular invasion violate the one-act, one-crime doctrine. We address defendant's arguments in turn.

¶ 51                    A. Defendant's Aggravated Vehicular Hijacking Conviction

¶ 52    Defendant first asserts that his aggravated vehicular hijacking conviction must be reversed. Relying on *People v. McCarter*, 2011 IL App (1st) 092864, he argues that to prove he committed vehicular hijacking, the State was required to show he actually dispossessed Rimmer of the shuttle bus rather than merely forcing Rimmer to drive it. Although the State acknowledges the holding in *McCarter,* it contends that it was wrongly decided because it relied on *People v. Strickland*, 154 Ill. 2d 489, 525 (1992), an armed robbery case that predated the creation of the vehicular hijacking statute. See Pub. Act 88-351, § 5 (eff. Aug. 13, 1993) (adding 720 ILCS 5/18-3, 18-4) (creating the offenses of vehicular hijacking and aggravated vehicular hijacking). It contends that the offense of vehicular hijacking should be "analyzed on its own terms," and that it should include "commandeering" a vehicle by forcing the victim to drive it.

¶ 53    In arguing that the undisputed facts of his case did not amount to vehicular hijacking, defendant has presented a matter of statutory construction; accordingly, our review is *de novo*. *People v. Brown*, 2013 IL 114196, ¶ 35. The primary aim of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Whitney*, 188 Ill. 2d 91, 97 (1999). The plain language of a statute is the best means of determining legislative intent, and, where the statutory language is clear and not ambiguous, it should be given its plain and ordinary meaning. *Id*. However, if the statutory language is ambiguous, a court may consider other extrinsic aids for

construction, including legislative history, to resolve the ambiguity and determine legislative intent. *Id*. at 97-98. Where the statute we are analyzing is penal in nature, the rule of lenity requires that any ambiguity be strictly construed and resolved in favor of the defendant (*id*. at 98), with nothing taken by intendment or implication beyond the obvious or literal meaning of the statute (*People v. Laubscher,* 183 Ill. 2d 330, 337 (1998)).

¶ 54    To sustain defendant's aggravated vehicular hijacking conviction, the State was required to show that he committed vehicular hijacking while armed with a dangerous weapon other than a firearm. 720 ILCS 5/18-4(a)(3) (West 2006). A person commits vehicular hijacking when he takes a motor vehicle from the person or immediate presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-3(a) (West 2006).

¶ 55    In *McCarter*, the defendant was charged and convicted of murder, aggravated kidnapping, armed robbery, concealment of a homicidal death and aggravated vehicular hijacking, based on evidence which established that he and his brother had entered the victim's car, forced him to drive it to another location, shot him, and lit his car on fire. *McCarter*, 2011 IL App (1st) 092864, ¶ 3. The defendant challenged all five of his convictions, and this court affirmed the convictions for murder, aggravated kidnapping, and concealment of a homicidal death.[3] In analyzing his aggravated vehicular hijacking conviction, however, this court considered whether there was sufficient evidence to support a finding that defendant "took" the motor vehicle from the victim, when there was no evidence showing that the victim had been

---

[3] We reversed defendant's conviction for armed robbery where the only evidence showing that he and his brother had taken money from the victim was inadmissible hearsay, and where the victim was discovered with a "wad of burnt up money," which tended to show that money had not been taken from him.

actually dispossessed of his vehicle. *Id.* ¶¶ 71-74. In rejecting the State's argument that the taking element could be satisfied by the defendant " 'taking control over the victim's car in his presence,' " this court noted that there had been no published decision issued as to whether a defendant could "take" a vehicle, within the meaning of the vehicular hijacking statute, by merely forcing the victim to drive his car to another location. *Id.* ¶ 74. Accordingly, we looked to the supreme court's decision in *Strickland*, 154 Ill. 2d at 525, in which it considered whether the "taking" element of the robbery statute (720 ILCS 5/18-1(a) (West 1992)) had been satisfied in similar factual circumstances. *McCarter*, 2011 IL App (1st) 092864, ¶¶ 75-76.

¶ 56    In *Strickland*, the defendant was charged and convicted of a number of offenses relating to the murder of a police officer. The evidence there showed that after shooting the officer, the defendant and his brother abandoned their car, got into the backseat of the victim's car in Buffalo Grove, and ordered him at gunpoint to drive them to California. The group drove to downtown Chicago, where the victim saw a marked police car and stopped to alert the officer. At that point, the defendant and his brother fled from the car, and were apprehended thereafter. *Strickland*, 154 Ill. 2d at 499-500. Defendant was convicted of armed robbery based on the "taking" of the victim's vehicle, and, on appeal, the defendant argued that there was no evidence to support that element where the victim remained in operation of the car throughout the time he and his brother were present. *Id.* at 525. In response, the State argued that the defendant and his brother effectively controlled the use of the victim's vehicle such that they were in constructive possession of the vehicle. *Id.*

¶ 57    The supreme court agreed with the defendant that the evidence was insufficient to sustain his armed robbery conviction, noting that the offense of robbery is " 'complete when force or threat of force causes the victim to part with possession or custody of property against his will.' "

*Id.* at 526 (quoting *People v. Smith*, 78 Ill. 2d 298, 303 (1980)). Although the supreme court observed that defendant and his brother's actions "certainly denied [the victim] a large measure of control over his vehicle," it reversed the defendant's armed robbery conviction, finding no evidence to show that the victim's car was removed from his actual possession. *Id.*

¶ 58    In so holding, the supreme court "implicitly rejected" the State's argument that " 'taking control over the victim's car in his presence' " was sufficient to effectuate a "taking," as the supreme court gave no weight to the defendant's actions that denied the victim a large amount of control over his car. *McCarter*, 2011 IL App (1st) 092864, ¶ 78 (citing *Strickland*, 154 Ill. 2d at 526). After reviewing the *Strickland* decision, this court similarly found no evidence in *McCarter* to show that the victim had been dispossessed of his car, and concluded that the State had failed to establish the taking element. *Id.* ¶ 79. Based on this precedent, we conclude that the taking element of the aggravated vehicular hijacking statute requires that the defendant " 'cause[] the victim to part with possession or custody of [the vehicle] against his will.' " *Strickland*, 154 Ill. 2d at 526 (quoting *People v. Smith*, 78 Ill. 2d 298, 303 (1980)).

¶ 59    After reviewing the evidence presented at defendant's trial, as summarized below, we conclude that the State failed to prove the taking element beyond a reasonable doubt. The facts established that defendant boarded the bus, threatened Rimmer with a shank, and told him to drive. Rimmer began to move the bus, and moments later, reached over and opened the bus door, which caused the brakes to lock up and throw defendant forward. Rimmer grabbed defendant's arm and began wrestling with defendant, and shortly thereafter, defendant fled the bus and was apprehended almost immediately. While defendant's actions may have denied Rimmer a "measure of control" (*id.*) over his vehicle, there was no evidence that defendant actually took possession of the bus, or removed it from Rimmer's custody or possession. In the absence of

such evidence, we must conclude, like in *Strickland* and *McCarter*, that defendant's conviction must be reversed.

¶ 60    Given the clear instruction of *McCarter* and *Strickland* as discussed above, we do not find the language of the vehicular hijacking statute to be ambiguous. However, even if we were to so find, our conclusion would remain the same because it is supported by the legislative history of the Illinois vehicular hijacking statute. As we recognized in *McCarter*, the language of the vehicular hijacking statute was written to closely track the language of the robbery statute. Compare 720 ILCS 5/18-3(a) (West 2006) ("[a] person commits vehicular hijacking when he or she takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force") and 720 ILCS 5/18-1(a) (West 2006) ("A person commits robbery when he or she takes property, except a motor vehicle *** from the person or presence of another by the use of force or threatening the imminent use of force.").

¶ 61    Other than the nature of the property which is taken, one of the key differences between the vehicular hijacking statute and the robbery statute is the applicable felony classes and available punishments. While robbery is a Class 2 probationable felony, the legislature created the offense of vehicular hijacking as a Class 1 nonprobationable felony. 720 ILCS 5/18-1(b), 18-3(c) (West 2006); 730 ILCS 5/5-5-3(c)(2)(K) (West 2006). If a person commits robbery or vehicular hijacking while armed with a dangerous weapon other than a firearm, both offenses are increased to Class X felonies, but aggravated vehicular hijacking is additionally subject to an increased minimum sentence of seven years' imprisonment.  720 ILCS 5/18-2(b), 18-4(b) (West 2006) ("Aggravated vehicular hijacking in violation of subsection (a)(3) [while armed with a dangerous weapon other than a firearm] is a Class X felony for which a term of imprisonment of not less than 7 years shall be imposed.").

¶ 62    Based on this comparison, we conclude that the intent of the legislature in enacting the vehicular hijacking statute was to recognize the seriousness of taking a motor vehicle, versus taking another type of property, and increase the penalty for that offense accordingly. See Ill. Const. 1970, art. I, § 11 ("[a]ll penalties shall be determined both according to the *seriousness* of the offense and with the objective of restoring the offender to useful citizenship" (emphasis added)).

¶ 63    In explaining Senate Bill 902, which created the offenses of vehicular hijacking and aggravated vehicular hijacking, its sponsor, Senator Hawkinson, made the following comments:

"Unfortunately, in our society from time to time a new—new genre of crime comes along. We're all too familiar with the tragedies around the country of—of car hijacking where someone armed or unarmed attacks a car, and either snatches the driver out; sometimes the driver, as we read yesterday about one story, is dragged, because they're caught in the rush, and—and caught by a seat belt or something and dragged and seriously injured or killed; sometimes these carjackings occur where a young child is a passenger in the car and is taken for a ride after a mother or father is—is yanked from the car. *** What it does, if the aggravating factors of being armed with a weapon or you have a youngster or a senior citizen passenger, it is a Class X felony with a minimum seven years, and if there is not an aggravating factor present, it is still a mandatory minimum sentence that is imposed, so there will be imprisonment in the penitentiary." 88th Ill. Gen. Assem., Senate Proceedings, April 15, 1993, at 281 (statements of Senator Hawkinson).

¶ 64    Senator LaPaille, a chief cosponsor of the bill, added that it was "about time" that the legislature "put the thugs and the criminals who carjack cars, take children away with them from their parents when they're in shopping centers, and create havoc on the roads and—and—and commit crimes and rape, et cetera, behind bars where they belong." *Id.* at 283 (statements of Senator LaPaille). In the House, Representative Homer, the House sponsor of the bill, explained that the bill was meant "to address that situation that an assailant takes a car away from an individual, from their presence, and it's a growing problem in this state as it is in the nation. We need to make it a tough crime and send a strong signal to the perpetrators of this offense." 88th Ill. Gen. Assem., House Proceedings, May 19, 1993, at 39 (statements of Representative Homer).

¶ 65    Around the same time that the legislature was considering Senate Bill 902, it was also debating a similar piece of legislation, House Bill 35. In discussing House Bill 35, Representative Novak set out the offense and available penalties, and stated:

> "This Bill… is very similar to the one that passed out of the Senate that is now in
> the House. And it is also is stronger than the one that we have on the federal level
> because the federal carjacking Bill only applies if the defendant was armed with a
> firearm. We are all aware of the…this particular category of crime that is
> occurring around the country. *** I think it's about time that we put a carjacking
> Bill on the books in Illinois to send a very strong message to the gang-bangers
> and to those who use this device to perpetrate crimes on innocent people that
> it…will not be tolerated, and their particular *** behavior will be punished in a
> very definitive manner." 88th Ill. Gen. Assem., House Proceedings, April 20,
> 1993, at 164 (statements of Representative Novak).

¶ 66    As these comments make abundantly clear, the legislature's intent in creating the offense of vehicular hijacking, was to "make it a tough crime" (88th Ill. Gen. Assem., House Proceedings, May 19, 1993, at 39 (statements of Representative Homer)), and to "send a very strong message *** [that it would] be punished in a very definitive manner" (88th Ill. Gen. Assem., House Proceedings, April 20, 1993, at 164 (statements of Representative Novak)). Accordingly, the vehicular hijacking statute increased the penalties available to those who commit vehicular hijacking and aggravated vehicular hijacking, beyond that which was authorized for the analog crimes of robbery and armed robbery.

¶ 67    Concomitantly, we observe that both the vehicular hijacking and robbery statutes require that the defendant *take*, respectively, a motor vehicle, or property other than a motor vehicle, from the victim. Although the taking element of the robbery statute had been previously interpreted by our supreme court in *Strickland* to require the defendant to actually dispossess, or take custody from, the victim, not merely exercise of control over the property, the legislature chose to track that same language in creating the vehicular hijacking statute in 1993, defining the offense as occurring when a defendant "*takes* a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18-3(a) (West 2006). The rules of statutory construction recognize that we are to presume the legislature was aware of how this language has been construed in the courts, and where the legislature did not modify that language, we presume that it intended to maintain the previously-settled meaning of the term "takes." See*, e.g., People v. Young*, 2011 IL 111886, ¶ 17 (where a term has a settled legal meaning, we will normally infer the legislature intended to incorporate the established meaning); *People v. Hickman*, 163 Ill. 2d 250, 262 (1994) (where statutes are enacted after judicial opinions, we presume the legislature acted with knowledge of

the prevailing case law). As a result, we do not believe that the legislature's intent in creating the vehicular hijacking statute was to change the meaning of a word which had been previously defined by our supreme court. We therefore adhere to our prior holding in *McCarter*, and conclude that the taking element of the aggravated vehicle hijacking statute requires more than the facts demonstrated here.

¶ 68    The State, however, argues that interpreting *McCarter* to require evidence of actual dispossession would lead to "absurd" results and would "negate any 'carjacking' that involve[s] the victim still inside or on the car itself." Instead, it asks this court to interpret the Illinois statute in line with decisions interpreting the federal carjacking statute which, it claims, "rightly recognize that the offense can be committed without having to 'take away' or 'dispossess' the victim of the vehicle." The State also cites a number of out-of-state cases, which it asks this court to look to as "persuasive authority for a logical construction of Illinois' own carjacking statute to include the scenario where an offender commandeers a vehicle by forcing the victim to drive the vehicle, while the victim is under the defendant's control by force or threat of force." The dissent agrees, and similarly relies on a number of federal and out-of-state cases for the proposition that "a defendant need not remove the victim from the car" to be guilty of carjacking.

¶ 69    Initially, we must clarify that we did not conclude in *McCarter*, nor do we conclude in this case, that our vehicular hijacking statute requires a defendant to *actually remove* the victim from his vehicle. While removing a victim from his vehicle would be one way to dispossess him of that vehicle, as defendant acknowledges, there are undoubtedly circumstances in which a defendant can "take" a vehicle from a victim while the victim still remains inside. However, the determination of whether a victim has been dispossessed of his vehicle is a fact-specific inquiry, which turns on the particular circumstances of each case. As we noted in *McCarter*, our decision

was limited to the facts of that case, and under those circumstances we were "compelled to conclude that the State failed to establish the taking element." Similarly here, after a review of the record, we conclude that the evidence was insufficient to show that defendant dispossessed Rimmer of his vehicle.

¶ 70    We also note that this court is not bound by federal or out-of-state decisions, particularly where, as here, we are interpreting an Illinois statute. *Sundance Homes, Inc. v. County of Du Page,* 195 Ill. 2d 257, 276 (2001); *People v. Fern*, 240 Ill. App. 3d 1031, 1039-40 (1993) ("In construing our own State laws, we are not bound by Federal court decisions other than, in appropriate cases, those of the United States Supreme Court ***.").  The dissent cites *Andrews v. Gonzalez*, 2014 IL App (1st) 140342, ¶ 23, for the proposition that "comparable court decisions of other jurisdictions are persuasive authority and entitled to respect," (internal quotation marks omitted).  In *Andrews*, however, this court was considering a matter of first impression in Illinois, and "[g]iven the lack of Illinois case law on point, we [chose] to examine" the foreign cases. *Id.* In this case, the State's and dissent's reliance on federal and out-of-state cases is particularly problematic, because courts in our own jurisdiction have already spoken on this issue. Where we have clear precedent from Illinois courts interpreting an Illinois statute, we do not believe it is necessary or appropriate to look to foreign authority to second-guess our own interpretation.

¶ 71    We acknowledge that some foreign jurisdictions have found the taking element of their own statutes to be satisfied in situations where a defendant has forced a victim to drive his own vehicle to a different location (See *United States v. DeLaCorte*, 113 F.3d 154 (9th Cir. 1997); *Williams v. State*, 990 So. 2d 1122 (Fla. Dist. Ct. App. 2008); *People v. Duran*, 106 Cal. Rptr. 2d 812, 814, 816 (Cal. Ct. App. 2001)), however, we find that this interpretation is clearly contrary

to the approach instructed by our supreme court. The foreign cases relied on by the dissent have generally utilized a "control" based analysis to the taking element of their respective statutes—an approach which our supreme court has explicitly rejected. Compare *DeLaCorte*, 113 F.3d at 156 (noting that the federal carjacking statute, and other robbery offenses, require " 'simply the acquisition by the robber of possession, dominion *or control* of the property for some period of time' " (emphasis added) (quoting *United States v. Moore*, 73 F.3d 666, 669 (6th Cir. 1996), *cert. denied*, 517 U.S. 1228 (1996) and *Williams*, 990 So. 2d at 1123 ("It is enough that the defendant obtains control over the driver of the vehicle through force or violence, threats of force or violence, or by putting the driver in fear") with *Strickland*, 154 Ill. 2d at 526 ("Although the [defendants'] actions certainly denied [the victim] a large measure of control over his vehicle *** the automobile was never removed from [the victim's] actual possession." As this comparison makes clear, our supreme court has indicated that merely denying the victim "a large measure of control over his vehicle" is not enough to find that defendant "took" that vehicle, while such a showing would be enough to establish the taking element of various federal and out-of-state carjacking statutes. Instead, in Illinois the taking element of the vehicular hijacking statute is only established when defendant "causes the victim to part with possession or custody of [the vehicle] against his will." (Internal quotation marks omitted.) *Id.*

¶ 72    Although the dissent contends that the carjacking statutes from foreign jurisdictions have "almost identical" language to our own, our review of those statutes shows that they are not particularly similar to the Illinois statute. As noted above, the Illinois vehicular hijacking statute applies when a defendant knowingly "takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3(a) (West 2006). By contrast, a person violates the federal carjacking statute when he or

she "with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, *or attempts to do so*." (Emphasis added.) 18 U.S.C. § 2119 (2006). This statute is different, and in some ways much broader, than the Illinois vehicular hijacking offense: most glaringly, it applies in situations in which a defendant merely attempts to take a motor vehicle. Also, the taking requirement of the federal statute has also been interpreted to require " 'simply the acquisition \*\*\* of possession, dominion or control of the [vehicle] fo*r some period of time*.' " (Emphasis added.) *DeLaCorte*, 113 F.3d at 156 (quotin*g United States v. Moore*, 73 F. 3d 666, 669 (6th Cir. 1996), *cert. denied*, 517 U.S. 1228 (1996). Our statute has never been interpreted to apply in such broad temporal contexts.

¶ 73     The out-of-state statutes relied on by the dissent are equally broad, dissimilar, and ultimately unhelpful to an analysis of our vehicular hijacking statute.  In *Williams v. State*, 990 So. 2d 1122 (Fla. Dist. Ct. App. 2008), the Florida appellate court considered the Florida carjacking statute, which provides that " '[c]arjacking' means the taking of a motor vehicle *which may be the subject of larceny* from the person or custody of another, with intent to either permanently or *temporarily deprive* the owner of the motor vehicle, when in the course of the taking there is the use of force, violence, assault, or putting in fear." (Emphases added and omitted). *Id.* (quoting Fla. Stat. § 812.133(1) (2006).  This statute interjects the concept of "larceny" and prohibits mere temporary deprivations—notions which are notably absent in our own statute. See also *People v. Duran*, 106 Cal. Rptr. 2d 812, 815 (Cal. Ct. App. 2001) (considering the California carjacking statute, which states that " ' "carjacking" ' is the felonious taking of a motor vehicle in the possession of another, from his or her person or in the immediate presence \*\*\* against his or her will and with the intent to either permanently or *temporarily*

*deprive* the person in possession of the motor vehicle of his or her possession, accomplished by force or fear." (Emphases added and omitted.) (quoting Cal. Penal Code § 215 (West 2000))).

¶ 74    In *Bruce v. State*, 555 S.E. 2d 819 (Ga. Ct. App. 2001), the Georgia appellate court reflected on the Georgia offense of hijacking a motor vehicle, which is complete when a "person while in possession of a firearm or weapon *obtains* a motor vehicle from the person or presence of another by force and violence or intimidation *or attempts or conspires to do so*." (Emphases added). Ga. Code Ann. § 16-5-44.1(b) (2000).The Georgia statute includes both attempts and conspiracy, and couches its language in terms of "obtaining" a motor vehicle, which the court explained, "encompasses the notion of acquiring control thereof, regardless of whether the victim remains with the vehicle." *Bruce*, 555 S.E. 2d at 823. By contrast, our statute contains no references to conspiracy, attempt, or obtaining, and, as stated, our supreme court has specifically rejected a control-based application of our statute. See also *People v. Green*, 580 N.W. 2d 444, 449-50 (Mich. Ct. App. 1998) (Under the pre-2004 version of the Michigan carjacking statute, "A person who by force or violence, or by threat of force or violence, or by putting in fear *robs, steals, or takes* a motor vehicle \*\*\* from another person, in the presence of that person or the presence of a passenger or in the presence of any other person in lawful possession of the motor vehicle, is guilty of carjacking \*\*\*." (Emphasis added.) (Citing Mich. Comp. Laws Ann. § 750.529a(1) (West 1994); *Winstead v. United States*, 809 A.2d 607, 610 n.3 (D.C. 2002) (In D.C., " 'A person commits the offense of carjacking if, by any means, that person knowingly or recklessly by force or violence, whether against resistance or *by sudden or stealthy seizure or snatching,* or by putting in fear, *or attempts to do so*, shall take from another person immediate actual possession of a person's motor vehicle.' " (Emphases added.) (quoting D.C. Code § 22-2803 (2001)). As the foregoing analysis shows, the carjacking statutes used in the federal system

and in other states, are far from "almost identical" to our own statute, and for this reason, we do not find their analyses compelling to an interpretation of the Illinois statute.

¶ 75    In addition, none of the federal cases the State cites involve an analysis of the taking element of the statute, or whether it can be established without proof that the defendant dispossessed the victim of his vehicle. See *United States v. Figueroa-Cartagena*, 612 F.3d 69, 75 (1st Cir. 2010) (analyzing whether there was sufficient evidence to sustain the defendant's various carjacking convictions where her involvement in the offense began after the other perpetrators had seized the vehicle); *United States v. Lebrón-Cepeda*, 324 F.3d 52 (1st Cir. 2003) (considering whether the *mens rea* element of the carjacking statute had been proven over the defendants' claim that their intent to seriously harm or kill the victim was formed *after* taking control of his vehicle); *Chatman v. Arnold*, No. 2:2014CV05896 (C.D. Cal. Apr. 29, 2015) (unpublished federal magistrate order dismissing the defendant's *habeas corpus* petition, which alleged he was denied effective assistance of counsel where counsel failed to obtain phone records which he claimed would have shown that he did not carjack the victim, but instead, that he was trying to purchase drugs from the victim and that the "drug deal [had] gone wrong."); *People v. Johnson*, 60 Cal. 4th 966, 343 P.3d 808 (Cal. 2015), (analyzing whether there was sufficient evidence to prove that defendant intended to take the victim's car at the time he killed her, and whether he took the victim's vehicle from her "person or immediate presence"). Because these cases did not consider the taking element of a state or federal carjacking statute—let alone the taking element of our own state statute—we find the State's reliance on them unconvincing.

¶ 76    Furthermore, the factual scenarios underlying these cases are decidedly different than the facts of this case, and show that those defendants did far more than "force[] the victim[s] to drive on [their] command." In *Figueroa-Cartagena*, the evidence showed that one of the perpetrators

bragged about taking the victim's vehicle "policeman style," which was understood to mean "that they stopped the car . . . with the weapon, and they said, this is the police." The perpetrators then drove the vehicle to defendant's brother's house with the victim in the backseat, and the victim's dead body was later discovered in the backseat of the vehicle. *United States v. Figueroa-Cartagena*, 612 F.3d 69, 72 (1st Cir. 2010) (referring to the codefendant's companion opinion, *United States v. Castro-Davis,* 612 F.3d 53 (1st Cir. 2009), for the evidence adduced at trial). In *United States v. Lebrón-Cepeda*, 324 F.3d 52, 55 (1st Cir. 2003), the three offenders "pulled open the car doors and ordered [the victims] *** to move into the car's backseat." The victims complied, and the defendant "took the wheel" and "drove away."

¶ 77    In *Chatman v. Arnold*, No. 2:2014CV05896 (C.D. Cal. Apr. 29, 2015), the petitioner entered the passenger side of the victim's truck, and "tried to position himself between [the victim] and the steering wheel." The petitioner "fought [with the victim] to control the steering wheel," "stepped on the gas" and "eventually was able to commandeer the truck down the street a short way ***, veering onto the sidewalk, hitting three parked cars and eventually crashing to a stop."

¶ 78    Finally, in *Johnson*, 343 P.3d 808, the defendant found and murdered the victim in her kitchen, stole her car keys, and used those keys to steal her car from the garage. In determining whether there was evidence to show that the vehicle had been taken from her "immediate presence," the California Supreme Court looked to the state's robbery statute, observing that the legislature enacted the carjacking statute after it had "definitively interpreted the phrase 'immediate presence' " in the robbery statute. *Id*. at 827. Accordingly, the court "presume[d] that when the Legislature employs words that have been judicially construed (and especially so recently), it intends the words to have the meaning the courts have given them." *Id*. Rather than

provide support for the State's suggested interpretation of the Illinois vehicular hijacking statute, we find that the cases cited by the State draw attention to the deficiency of evidence of a taking in this case, and confirm our conclusion that defendant's conviction must be reversed.

¶ 79    The dissent also relies on a dictionary definition of the word "hijacking" from the statutory title to conclude that a defendant need not dispossess the victim of his vehicle. We do not believe that the consideration of the statutory title is appropriate in this case. Our supreme court has repeatedly indicated that "[w]hen the legislature enacts an official title or heading to accompany a statutory provision, that title or heading is considered only as a 'short-hand reference to the general subject matter involved' in that statutory section, and 'cannot limit the plain meaning of the text.' " *Michigan Avenue National Bank v. County of Cook,* 191 Ill. 2d 493, 505-06 (2000) (quoting *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 528-29 (1947)). Official headings or titles are of use " 'only when they shed light on some ambiguous word or phrase' " within the text; they " 'cannot undo or limit that which the text makes plain.' " *Id.* at 506 (quoting *Brotherhood of R.R. Trainmen,* 331 U.S. at 529). Because we do not find the statute's meaning to be ambiguous, we need not, and indeed should not, look to the statutory heading for an alternative interpretation.

¶ 80    Before ending our discussion, we reiterate that the determination of whether a taking has occurred must be a fact based inquiry, and our decision here is limited to the facts of this case. Although the dissent contends that our decision leads to an "absurd legislative result" by posing a specific scenario, we will not speculate on whether another set of facts would constitute a dispossession, because our decision is limited to the facts presented here.

¶ 81    Finally, we address the State's contention that even if the evidence is insufficient to support defendant's aggravated vehicular hijacking conviction, "outright reversal is not

warranted" and we should "enter judgment on an attempt." It maintains that "[b]y defendant's own reasoning, the offense is not completed until defendant is successful in 'taking' the bus away from the victim. Since that did not happen because the driver quickly responded to defendant's threat and police were able to capture defendant before he was able to complete the crime, the offense was attempt[ed] vehicular hijacking."

¶ 82    However, the State points to no evidence, and we find none, which would suggest that defendant intended to remove the bus from Rimmer's possession as would be required to support an attempt conviction. See 720 ILCS 5/8-4(a) (West 2006) (an attempt crime is proven if a defendant does any act that constitutes a substantial step toward commission of a specific offense, *with the intent to commit that offense*). We therefore decline the State's invitation to enter judgment for an attempt crime, and reverse defendant's conviction for aggravated vehicular hijacking.

¶ 83                          B. Defendant's Vehicular Invasion Conviction

¶ 84    Defendant next argues that his vehicular invasion conviction must be reversed, because there was insufficient evidence to prove that he used force to enter the shuttle bus. The State responds that defendant was properly convicted of that offense, where he used and threatened force immediately after entering the bus, and where his actions were "connected, related, and together comprised the offense of vehicular invasion."

¶ 85    To sustain defendant's vehicular invasion conviction in this case, the State was required to prove that defendant knowingly, by force and without lawful justification, entered the interior of the occupied bus, with the intent to commit the felony of escape therein. 720 ILCS 5/12-11.1 (West 2006). Defendant challenges only the evidence to prove that he entered the bus "by force," maintaining that his entry was not forceful, as he entered through the open door. Because

defendant argues that the undisputed facts of his case did not amount to vehicular invasion, defendant has, again, presented a matter of statutory construction, for which our review is *de novo*. *Brown*, 2013 IL 114196, ¶ 35.

¶ 86    In arguing that his entry was not forceful, defendant acknowledges that the Second District Appellate Court "rejected a similar argument" in *People v. Isunza*, 396 Ill. App. 3d 127 (2009), but he maintains that the facts of that case are distinguishable from the case at bar. In *Isunza*, the defendant similarly argued that he did not use force to enter the victim's vehicle when he reached in through the open window and punched her. *Id.* at 131. The court, however, determined that the open window was not dispositive of whether defendant used force to reach into the vehicle, and that defendant's act of punching the victim while he stood outside her vehicle as she was sitting inside her car satisfied the element of using force to reach into the car. *Id.* We reach the same conclusion here where the evidence showed that defendant rushed onto the bus, threatened to stab Rimmer in the neck with a knife, and then engaged in a struggle with Rimmer during which he repeatedly stabbed him in the face and chest.

¶ 87    Defendant, however, distinguishes his entry from that in *Isunza*, and contends that his "entry into the bus and subsequent acts inside were distinct physical acts" whereas in *Isunza*, the "acts of force and entry *** were one and the same." Relatedly, he maintains that he did not use actual force but merely "*threatened* the use of force" (emphasis in original) upon entering the bus. See 720 ILCS 5/12-11.1(a) (West 2006) (requiring entry "by force"). He acknowledges that he subsequently "used force" when Rimmer "engaged him in a struggle" but contends that this use of force was insufficient to sustain his conviction because it "only occurred after he completed his entry."

¶ 88    In considering defendant's claims, we are instructed by cases interpreting the force element in the robbery context, which have concluded that the force need not occur at the actual moment of taking, but it is sufficient if the force and the taking are part of a series of events constituting a single incident. *People v. Lewis*, 165 Ill. 2d 305, 339 (1995) ("As long as there is some concurrence between the defendant's threat of force and the taking of the victim's property, a conviction for armed robbery is proper."); *People v. Brooks*, 202 Ill. App. 3d 164, 170 (1990), *abrogated on other grounds by People v. Williams*, 149 Ill. 2d 467 (1992).

¶ 89    In *Brooks*, (*id*. at 167-68), the defendant challenged his robbery conviction, claiming that the evidence was insufficient to prove that he took the victim's property by force or threat of force. At trial, the victim testified that she was seated on a CTA bus in Chicago, when she discovered that her wallet was missing from her purse. The victim turned around and saw defendant, who was seated behind her, with her wallet in his hands. The victim demanded the return of her wallet, but defendant pushed her left shoulder and ran away from the bus. On appeal, the defendant argued that his conviction should be reversed because no force was used in the actual taking of the wallet. The court disagreed, noting that the force or threatened force "need not transpire before or during the time the property is taken" but that it could be "used as part of a series of events constituting a single incident." *Id.* at 170. The court further stated that an offense can "constitute robbery where the perpetrator defends against a challenge immediately upon the taking or where the perpetrator's departure is accomplished by the use of force. [Citations.]" *Id*. The court then concluded that the defendant's push, "used in a series of events involving a single incident and in response to the victim's challenge immediately upon the taking and before defendant's departure, is sufficient to sustain the robbery conviction." *Id*.

¶ 90    Similarly here, the evidence established at trial shows that defendant struggled with Rimmer, and repeatedly stabbed him in the face and chest, when he attempted to resist defendant's demands. This use of force was part of a series of closely connected events, and occurred "in response to the victim's challenge" and "before defendant's departure." *Id*. In these circumstances, we conclude that defendant's actions were sufficient to sustain his vehicular invasion conviction.

¶ 91    In so holding, we also note that we need not reach defendant's alternative challenge to his vehicular invasion conviction—that it must be reversed because the imposition of convictions for both aggravated vehicular hijacking and vehicular invasion violate the one-act, one-crime rule. Because we previously found that his conviction for aggravated vehicular hijacking must be reversed, there can be no one-act, one-crime rule violation.

¶ 92        C. The Variance In Defendant's Attempted Armed Robbery Charge and Conviction

¶ 93    Defendant next contends that a fatal variance existed between his attempted armed robbery indictment and the proof and jury instructions as to that charge. The State responds that defendant caused any variance between the indictment and the proof and conviction and thus cannot claim that he was misled by it. Furthermore, the State argues, no fatal variance occurred, as the indictment contained all of the essential elements of attempted armed robbery and defendant is not subject to double jeopardy.

¶ 94    To be fatal, "a variance between the allegations in a criminal complaint and the proof at trial must be material and be of such character as may mislead the defendant in making his or her defense, or expose the defendant to double jeopardy." *People v. Maggette*, 195 Ill. 2d 336, 351 (2001). Where an indictment charges all of the essential elements of a crime, matters that are unnecessarily added may be regarded as surplusage. *People v. Collins*, 214 Ill. 2d 206, 219

(2005). A complaint must state the name of the accused; set forth the name, date and place of the offense; cite the statutory provision the defendant allegedly violated; and set forth in the statutory language the nature and elements of the charged offense. *Id.*

¶ 95    Defendant's attempted armed robbery indictment alleged that on or about March 22, 2007, he, with the intent to commit armed robbery, "did any act, to wit: reached for Vito Zaccaro's gun, which constituted a substantial step towards the commission of the offense of armed robbery." At trial, defendant testified that he was not reaching for Zaccaro's gun, but rather, his keys. During deliberations, the jury sent a note asking, "Is it attempted robbery on one specific item or anything at all? Example: Pen, badge, socks, shoes… Anything or one item?" The trial court responded to the jury, "Your instructions contain the definition of armed robbery. Reread the instruction. This instruction does not make reference to a specific piece of property and includes any property of the victim." The jury ultimately found defendant guilty of attempted armed robbery but not guilty of disarming a peace officer. Based on the jury's findings, defendant argues that it found him guilty of attempted armed robbery for attempting to take Zaccaro's keys. Accordingly, he argues a fatal variance existed between the crime he was charged with and the crime for which he was convicted.

¶ 96    Contrary to defendant's assertions, we find no fatal variance occurred. First, the allegation that defendant reached for Zaccaro's gun was not a material element of the attempted armed robbery charge. See *People v. Lewis*, 165 Ill. 2d 305, 340 (1995) (the essential elements of robbery are "taking property by force or threat of force. Nothing more is required to sustain the conviction."); see also *People v. Santiago*, 279 Ill. App. 3d 749, 754 (1996) (affirming the defendant's armed robbery conviction even though the information named the wrong victim). The indictment alleged that defendant, with the intent to commit armed robbery, by use of force

and while armed with a dangerous weapon other than a firearm, did any act which constituted a substantial step towards the commission of the offense of armed robbery. Thus, the indictment set forth all of the essential elements of attempted armed robbery, and the naming of the item that defendant attempted to take from Zaccaro was surplusage.

¶ 97    Defendant's reliance on *People v. Daniels*, 75 Ill. App. 3d 35 (1979), does not convince us otherwise. In *Daniels*, the defendants were charged with armed robbery for taking United States currency from the victim. *Id.* at 40. At trial, however, the only evidence presented in connection with the robbery related to the taking of a watch. *Id.* Furthermore, the State failed to prove defendant took the watch. *Id.* at 41. Thus, the *Daniels* court reversed the defendants' armed robbery convictions. *Id.* Unlike in *Daniels*, the evidence in this case was sufficient to establish that defendant tried to take Zaccaro's keys. Defendant admitted as much at trial. Defendant notes the *Daniels* court prefaced its discussion regarding the insufficiency of the evidence with the phrase, "We note additionally ***." *Id*. Thus, defendant argues the insufficiency of the evidence in *Daniels* had little bearing on the court's decision to reverse. However, our reading of *Daniels* shows both the variance and the insufficiency of the evidence factored into the court's determination that reversal was warranted.

¶ 98    In addition, the variance in defendant's case was not fatal because defendant is not exposed to the possibility of double jeopardy. "If any future prosecution were attempted, prior prosecution on the same facts could be proved by resort to the record." (Internal quotation marks omitted.) *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 71. Furthermore, we disagree with defendant that the variance in this case materially misled him. Notably, it was defendant and not the State who caused the variance in this case. While defendant argues that he was misled in the preparation of his defense, it is clear that any prejudice defendant suffered stemmed from his

own misapprehension of the law regarding the nature of indictments. Indeed, defendant acknowledged after receiving the jury's note that he "had a misconception" about indictments. Yet, the determination of whether a defendant is "materially misled" in the context of fatal variance cases focuses on whether the State's introduction of evidence that was not alleged in the indictment hampered the defendant's ability to prepare a defense. See, *e.g.*, *People v. Winford*, 383 Ill. App. 3d 1, 5-6 (2008) (the record contained no indication that the indictment's reference to cocaine misled defendant in making his defense or that the State's evidence surprised him, as the record showed the defendant believed he was on trial for heroin and his sole defense was that the State failed to prove his intent to deliver beyond a reasonable doubt); *People v. Jones*, 245 Ill. App. 3d 674, 676-77 (1993) (the defendant was not misled in preparing her defense where the indictment alleged the defendant exchanged a comforter for currency and the State's evidence established she conveyed a comforter in exchange for a refund slip, as her defense had nothing to do with whether she received a refund slip or currency in exchange for the comforter); *People v. Montgomery*, 96 Ill. App. 3d 994, 996, 998 (1981) (the defendant could not have been misled in preparing his defense where he was charged with the aggravated assault of one officer and the officers' testimony at trial established the defendant pointed a gun at another officer, since "the only issue [defendant] contested was whether he had a gun in his hand"). Where defendant caused the variance in his case, he cannot claim he was misled in the preparation of his defense.

¶ 99    In so concluding, we find unpersuasive defendant's reliance on *People v. Durdin*, 312 Ill. App. 3d 4 (2000), which he cites as providing an example of a situation like his wherein a defendant conceded a criminal act other than the one specified in the charging instrument. In *Durdin*, the defendant was charged with both delivery of cocaine within 1,000 feet of a public school and delivery of heroin. *Id*. He conceded that he bought heroin for an undercover officer

but claimed entrapment. *Id*. Thus, the *Durdin* defendant's confession that he bought heroin was not made in an attempt to defeat the language charging him with delivery of cocaine, but rather, to refute his delivery of heroin charge. Furthermore, unlike defendant, the defendant in *Durdin* was convicted of the wrong crime. *Id*. at 8. Here, defendant was convicted of the correct crime, and "[i]t would be an exercise in pointless formalism for us to reverse" defendant's conviction. *Santiago*, 279 Ill. App. 3d at 754.

¶ 100                              D. Shackles During Jury Selection

¶ 101    Defendant next asserts that he was deprived of due process where the trial court allowed him to remain shackled during jury selection without articulating the reasons establishing a manifest need for his restraints. He contends the shackles inhibited his ability to represent himself and prejudiced him in the eyes of the jurors, at least one of whom saw his restraints despite the curtain placed around his table.

¶ 102    The shackling of a defendant is generally disfavored because (1) it tends to prejudice the jury against the defendant, (2) it restricts the defendant's ability to assist his counsel during trial, and (3) it offends the dignity of the judicial process. *People v. Boose*, 66 Ill. 2d 261, 265 (1977). Nonetheless, a defendant may be shackled when the court has reason to believe the defendant may try to escape, he may pose a threat to the safety of people in the courtroom, or shackling is necessary to maintain order during trial. *Id.* at 266. Factors the court should consider in making its determination regarding shackling may include "[t]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size

and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies." (Internal quotation marks omitted.) *Id.* at 266-67. The court should place its reasons for shackling on the record and provide defense counsel with an opportunity to present reasons why the defendant should not be shackled. *People v. Allen*, 222 Ill. 2d 340, 353 (2006). We review a trial court's decision that shackling is necessary for an abuse of discretion. *People v. Urdiales*, 225 Ill. 2d 354, 416 (2007).[4]

¶ 103   We agree with defendant that the trial court violated his right to due process by failing to undertake a *Boose* analysis and state the reasons for shackling on the record before requiring him to remain shackled. We are guided by the supreme court's decision in *Allen*. There, the court did not undertake a *Boose* analysis before requiring a defendant to wear a stun belt, instead deferring to the sheriff's judgment. *Allen*, 222 Ill. 2d at 348. The supreme court held that the court's actions violated the defendant's due process rights. *Id.* at 349. As in *Allen*, here, the trial court conducted no *Boose* analysis and instead deferred to the DOC officers. When defendant asked prior to jury selection whether his shackles could be removed, the court responded it would "leave it at [DOC's] discretion." After defendant reminded the court that he had behaved appropriately at a prior hearing without shackles, the court stated, "You are preaching to the choir. All you have to do is talk to the men in charge. If you can convince those three men that you don't need leg

---

[4] Defendant contends our standard of review is *de novo*, arguing the trial court's failure to make a *Boose* analysis was undisputed and that the issue is therefore "the legal significance" of the court's failure to comply with *Boose*. However, defendant has cited no authority applying a *de novo* standard of review where a *Boose* analysis has not been conducted. To the contrary, Illinois courts have continued to cite the abuse of discretion standard even where no *Boose* analysis is made. See, *e.g.*, *Allen*, 222 Ill. 2d at 354.

shackles, you don't have to have them on." Later, defendant asked the court whether his shackles could be removed when trial "officially" commenced, and the court stated, "That's up to the Illinois Department of Corrections." After defendant persisted in his argument, the court stated it would take the matter under consideration and make a decision the following day. At the end of jury selection, the court asked a DOC officer about defendant's shackles, and the officer responded, "We keep them on unless you order them off." The court then entered an order that defendant's shackles be removed for the remainder of trial. Thus, rather than conduct a *Boose* analysis, the court initially deferred to the judgment of DOC but then subsequent to jury selection, after consulting with DOC officers, ordered the shackles removed for the trial.

¶ 104   The State suggests that rather than initially defer to the DOC officers, the trial court in fact agreed with them that defendant was a flight risk. Actually, the record shows that although initially deferring to the DOC on this issue, the trial court to its credit maintained a continuous dialogue with the defendant on the issue. At the same time, the trial court limited any prejudice incurred by the defendant by utilizing curtains during jury selection and also questioning the prospective jurors who noticed the shackles as to any effect that may have had on them. Ultimately, through this ongoing discussion, the defendant was able to convince the trial court that his shackles should be removed during trial based on his promises to comport himself appropriately as well as the limitations the shackles would impose on him during the trial process. In this regard, the trial court stated, at the end of jury selection, that it would sign an order allowing defendant's shackles to be removed the following day, as "people usually like to stand when they give their argument and move around a little bit." It is for these reasons, as well as others discussed below, that we ultimately find the error here to be very limited and in fact harmless.

¶ 105 Furthermore, because it is distinguishable, we find unpersuasive the State's reliance on *People v. Buss*, 187 Ill. 2d 144, 217 (1999), *abrogated on other grounds by In re G.O.*, 191 Ill. 2d 37, 46-50 (2000). In that case, the trial court did not state its reasons for requiring shackles prior to trial but later explained at a posttrial hearing that the basis for its decision was courtroom security, the serious nature of the offense with which the defendant was charged, and the large courtroom audience. *Id*. Unlike in *Buss*, at defendant's posttrial motion in this case, the court did not articulate why the shackles were necessary. In sum, we conclude the court violated defendant's right to due process by failing to conduct a *Boose* hearing with regard to the shackles during jury selection.

¶ 106 As defendant objected to his shackles at trial and in his posttrial motion, the State bears the burden of establishing " 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' " *Deck v. Missouri*, 544 U.S. 622, 635 (2005) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); see also *People v. Robinson*, 375 Ill. App. 3d 320, 333 (2007) ("The improper shackling of a defendant may be harmless error."). Three approaches exist for determining whether an error in a criminal trial is harmless under *Chapman*: (1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the defendant's conviction, and (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence. *In re A.H.*, 359 Ill. App. 3d 173, 183-84 (2005).

¶ 107 In this case, the evidence overwhelmingly supported defendant's convictions for vehicular invasion, attempted armed robbery, and escape. At trial, defendant admitted that he attempted to take Zaccaro's keys. He also admitted that he escaped, and the State strongly refuted his necessity defense with evidence that he had been convicted of murder just three days before

his escape, for which he faced a lengthy prison sentence. Further, although defendant claimed that his motive for escaping was an innocent one, his self-protection, his conduct as shown by the evidence was less than innocent, as it was extremely violent. During this chaotic escape, he inflicted injuries by stabbing or cutting no less than four people. Rimmer testified defendant entered the bus and threatened Rimmer to drive while holding an object in his hand. Furthermore, the record demonstrates that only one juror, McSorley, saw defendant's shackles, and upon questioning, McSorley said the shackles would not impede his ability to be fair and that he already knew defendant was being supervised based on the officers who were with defendant. Even assuming any of the other jurors saw or heard defendant's shackles, those jurors were already aware that defendant had been convicted of murder and was in custody for that offense. Furthermore, defendant was also released from his shackles and able to move freely about the courtroom for all portions of the trial except jury selection. Lastly, we are compelled to note that the policy considerations underlying the *Boose* decision and its progeny do not apply with equal force here. Based on the foregoing, we conclude the court's failure to conduct a *Boose* analysis was harmless error.

¶ 108   Contrary to defendant's assertions, the jury's notes and the length of time it spent deliberating does not show the evidence was close. While the jury sent notes during deliberation, those notes merely sought clarification on different terms and expressed that it was deadlocked on the kidnapping charge. However, the jury never stated that it was deadlocked on any of the charges for which defendant was convicted. See *People v. Wilmington*, 2013 IL 112938, ¶ 35 (concluding the evidence was not closely balanced under the first plain-error prong where the jury sent notes during deliberation but the record contained no indication "that the jury at any time had reached an impasse or that the jurors themselves considered this a close case").

Likewise, "the length of time a jury deliberates is not always an accurate indicator of whether the evidence was closely balanced." *People v. Walker*, 211 Ill. 2d 317, 342 (2004). The record does not disclose when the jury's deliberations commenced or finished; however, it shows the jury sent its first note at 2:15 p.m. and the court responded to the last note at 7:12 p.m. Given the number of charges and all of the evidence in this case, nothing about the length of the juror's deliberations leads us to conclude the evidence was close.

¶ 109   In sum, although the trial court erred when it failed to conduct a *Boose* analysis, we conclude that the error was harmless.

¶ 110                                   E. Details About Defendant's Prior Murder Conviction

¶ 111   Defendant next contends that the State injected excessive and irrelevant details regarding his prior murder conviction. Specifically, he contends the jury received a certified copy of conviction, which revealed, among other things, that he faced charges in addition to murder, that he was ordered to complete fitness examinations, that he was found guilty of seven counts of murder, that he was sentenced to life in prison, that he lost his appeal, and that he filed a postconviction petition that was denied. Defendant also notes that during cross-examination, the State elicited that he faced charges in addition to murder and asked him whether he personally discharged a firearm that caused death. Defendant was acquitted of aggravated kidnapping and convicted of only one count of first degree murder. *People v. Reese*, No. 1-07-1681 (2009) (unpublished order under Supreme Court Rule 23). Finally, defendant observes that although he testified he could not recall the jury finding he personally discharged a firearm that killed the victim, the State nonetheless argued that fact during closing argument. Based on all of the foregoing, defendant argues we should reverse and remand for a new trial.

¶ 112    Initially, we agree with the State that defendant invited the introduction of any evidence concerning his prior murder conviction. See *People v. Carter*, 208 Ill. 2d 309, 319 (2003) (under the doctrine of invited error, a defendant may not request to proceed in one manner and then claim on appeal that the course of action was erroneous). During a hearing on the State's motions *in limine*, the trial court ruled that the State could indicate only that defendant "was in custody on felony charges" and could not introduce defendant's murder conviction in its case-in-chief for purposes of proving motive. The court further ruled that if defendant testified, the State could introduce the murder conviction as impeachment and could introduce a certified copy of conviction and cross-examine defendant on the fact that he was convicted of murder in order to establish his motive. Before defendant testified at trial, the court reminded him that he would be cross-examined by the State, which could use his murder conviction as impeachment. The court told defendant that the State would be able to read in that he was convicted of first degree murder but would not be able to discuss the facts of the conviction. The court further explained that if defendant testified regarding a "necessity" defense, the State would be able to cross-examine him and rebut his motive with his murder case.

¶ 113    Despite the trial court's admonishments, defendant elected to testify on his own behalf. During his testimony, he maintained that he wanted to escape because he was attacked by guards and he wanted to expose the inhumane conditions in jail. Thus, consistent with the trial court's ruling, the State then introduced defendant's prior murder conviction and the sentence he faced in that case to both impeach his credibility and to rebut his "necessity" defense on the escape charge.

¶ 114    Moreover, even applying the plain-error doctrine, we find no cause for reversal. Under the plain-error doctrine, we may consider an unpreserved claim of error where a clear or obvious

error occurred and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Belknap*, 2014 IL 117094, ¶ 48. Our first step in plain-error review is determining whether error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 115   Evidence of other crimes is generally inadmissible to demonstrate a defendant's propensity to commit crimes. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). However, a defendant's prior conviction may be admitted for impeachment purposes. Ill. R. Evid. 609(a) (eff. Jan. 1, 2011); *People v. Mullins*, 242 Ill. 2d 1, 14 (2011) (citing *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971)). In addition, other-crimes evidence may be admissible to demonstrate motive. *Donoho*, 204 Ill. 2d at 170.

¶ 116   First, the record does not support defendant's claim that the jury was given a copy of the unredacted certified copy of conviction. When the State offered defendant's prior conviction into evidence during rebuttal, it read to the jury only that "defendant was found guilty by a verdict of guilty on the charge of first degree murder on March 19th, 2007." The court admitted the statement of conviction and disposition into evidence but indicated it would give a limiting instruction. Later, outside the presence of the jury, the State expressed that it was "going to send back all of [its] exhibits" to the jury "except for the Grand Jury transcript and the certified copy." The court responded, "Right. The Grand Jury transcript doesn't go back, everything else does." Thus, although the court stated only that the grand jury transcript would not be given to the jury, reading the court's response in conjunction with the State's comment makes clear that the State did not give the jury the certified copy of conviction. Absent any evidence that the certified copy

was actually brought to the jury room, we will not accept defendant's invitation to speculate that it was.

¶ 117   Turning to the State's cross-examination of defendant, we find no impropriety in the State's questioning of defendant as to whether the jury found he personally discharged a weapon. During his testimony, defendant maintained that he wanted to escape out of necessity after being beaten by prison officials. He also testified that he was convicted of a murder he did not commit. Thus, the State properly sought to refute defendant's testimony by establishing that he faced a life sentence. It was not just defendant's murder conviction but also the jury's finding that he personally discharged a weapon that exposed defendant to such a lengthy sentence. Defendant points out that the jury was never told the firearm finding exposed him to a life sentence; however, it was through its questioning of defendant that the State sought to explain that the finding did, in fact, expose defendant to a potential life sentence. In sum, where defendant testified that he tried to escape out of necessity, the State was entitled to present evidence of the jury's finding to establish defendant faced a potential life sentence and sought to escape for that reason and not, as he claimed, to avoid another beating and to expose the inhumane conditions of the jail.

¶ 118   Additionally, we find defendant's argument that it was improper for the State to include in its closing argument the fact that the murder conviction was accompanied by a finding that defendant personally discharged a firearm that caused death to be wholly without merit. Defendant contends that this fact was not admitted by defendant on cross-examination and was not proved up by the State. This argument ignores, however, that this factual assertion was correct and that the certified copy of conviction, which included all the matters defendant was convicted of, was admitted into evidence even though it was not given to the jury. Further,

defendant's argument that the prosecutor's passing remark on cross-examination that defendant was charged with murder, "among other things," was improper is also without merit. First, this was a brief, passing remark, and second, this remark may be interpreted to be a reference to the additional allegation concerning the discharge of the firearm.

¶ 119   In sum, we find no error in that regard.

¶ 120                              F. Defendant's Waiver of Counsel

¶ 121   Defendant next contends that the trial court failed to substantially comply with Rule 401(a), thereby rendering his waiver of counsel invalid. Acknowledging that he has forfeited review of his claim by failing to object at trial, defendant urges us to consider the matter under the plain-error doctrine. Our first step in plain-error review is to determine whether error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 122   The sixth amendment guarantees a defendant in a criminal proceeding "both the right to the assistance of counsel and the correlative right to proceed without counsel." *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) (citing *Faretta v. California*, 422 U.S. 806, 833-34 (1975)). A defendant may waive his right to counsel if his waiver is voluntary, knowing, and intelligent. *Id.* To that end, Rule 401(a) sets forth certain admonishments that the trial court must provide before a defendant may be found to have knowingly and intelligently waived counsel. *Id.* at 235-36. Specifically, the court must inform the defendant and determine that he understands (1) the nature of the charge, (2) "the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences," and (3) that he has a right to counsel and to have counsel appointed if he is indigent. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). Strict compliance with Rule 401(a) is not always required. *Haynes*, 174 Ill. 2d at 236. Instead, substantial compliance is

sufficient to effectuate a valid waiver of counsel if the record shows the defendant made his waiver knowingly and voluntarily and the admonishment he received did not prejudice his rights. *Id.* We review the trial court's compliance with Rule 401 *de novo*. *People v. Wright*, 2015 IL App (1st) 123496, ¶ 46.

¶ 123    Here we find that the trial court substantially complied with Rule 401(a). Defendant's sole argument as to the insufficiency of the court's admonishments is that it failed to inform him that any potential prison sentence would run consecutive to the sentence imposed for his murder conviction. However, even assuming that Rule 401(a)(2) required the court to provide such an admonishment, the record clearly reflects that defendant's waiver of counsel was knowing and voluntary despite the absence of that admonishment. The court informed defendant that he faced a sentence of up to 160 years on two of the attempted murder charges alone. The court also told defendant he was "looking at massive time" if he was convicted. Defendant indicated that he understood. The court then continued by explaining the extended-term sentences that could apply to defendant's other charges. When the court asked defendant whether he understood, defendant responded, "Perfectly, Your Honor, perfectly."

¶ 124    Thus, defendant clearly understood that he faced up to 160 years in prison on just two of the charges alone. He also knew that he was already serving a natural life sentence for his murder conviction. Based on the foregoing, defendant cannot claim that his waiver was not knowingly or intelligently made simply because the court did not inform him that his sentences would run consecutive to his murder sentence. See *People v. Campbell*, 224 Ill. 2d 80, 84 (2006) (the purpose of Rule 401(a) "is 'to ensure that a waiver of counsel is knowingly and intelligently made' " (quoting *Haynes*, 174 Ill. 2d at 241)). Whether defendant believed he would serve the possible 160-year sentence concurrent with or consecutive to the natural life sentence he was

already serving, defendant knew that he faced a possible 160-year sentence, which meant that he would spend the rest of his life in prison even if his prior murder conviction was overturned. For this reason, *People v. Koch*, 232 Ill. App. 3d 923 (1992), is distinguishable. There, the trial court admonished the defendant that he could receive a one- to three-year prison sentence but later imposed a five-year extended-term sentence. *Id.* at 925-26. By contrast, the court in this case told defendant he could serve 160 years in prison on just two charges, thereby admonishing defendant that he could spend the rest of his life in prison. Based on the foregoing, we conclude the court substantially complied with Rule 401(a).

¶ 125                                G. Extended-Term Sentences

¶ 126   Defendant next argues that the trial court's imposition of extended term sentences on all of his convictions was improper. The State concedes this error, and agrees that an extended term sentence was only authorized for those convictions within the most serious class of offenses.

¶ 127   When a defendant has been convicted of multiple offenses of differing classes, the trial court may impose an extended-term sentence only for the conviction or convictions that fall within the most serious class of offenses. *People v. Jordan*, 103 Ill. 2d 192, 206 (1984). However, extended-term sentences may be imposed "on separately charged, differing class offenses that arise from unrelated courses of conduct." *People v. Coleman*, 166 Ill. 2d 247, 257 (1995). To determine whether multiple convictions arise from unrelated courses of conduct, we must consider "whether there was a substantial change in the nature of the defendant's criminal objective." *People v. Bell*, 196 Ill. 2d 343, 354 (2001). Although defendant failed to challenge his extended-term sentences in the trial court, a sentence or portion thereof that is unauthorized by statute is void and may be attacked at any time or in any court. *People v. Thompson*, 209 Ill. 2d 19, 23, 27 (2004).

¶ 128   As the parties concede, the record in this case reflects that defendant's criminal objective throughout the commission of his crimes was to escape. During sentencing, the trial court expressly rejected the idea that defendant's escape was completed prior to the later offenses. Based on the foregoing, we agree with the parties that defendant's convictions did not arise from unrelated courses of conduct. Therefore, the court could only impose an extended term sentence on the offenses within the most serious class of felony.

¶ 129   As we have reversed defendant's conviction for Class X vehicular hijacking, the remaining offenses within the most serious class are defendant's Class 1 convictions for vehicular invasion (720 ILCS 5/12-11.1(b) (West 2006)) and attempted armed robbery (720 ILCS 5/8-4(c)(2), 18-2(a)(1), (b) (West 2006)). We therefore affirm the 30-year extended term sentences imposed on those two offenses, which were made consecutive to the life sentence defendant is serving on his prior murder conviction.

¶ 130   As to defendant's remaining Class 2 felony escape conviction, we conclude that it must be reduced to a nonextended term. Where, as here, "it is clear from the record the trial court intended to impose the maximum available sentence, we may use our power under Illinois Supreme Court Rule 615(b)(4), to reduce the sentence to the maximum nonextended term sentence." *People v. Ware*, 2014 IL App (1st) 120485, ¶ 32. Accordingly, we reduce defendant's sentence for escape to seven years, which is the maximum nonextended term for committing a Class 2 felony. 720 ILCS 5/31-6 (West 2006); 730 ILCS 5/5-8-1(a)(5) (West 2006) (now codified as 730 ILCS 5/5-4.5-35(a)).

¶ 131                              III. CONCLUSION

¶ 132   For the reasons stated, we reverse defendant's conviction for aggravated vehicular hijacking, and affirm his convictions for vehicular invasion, attempted armed robbery, and

escape. We affirm defendant's 30-year extended term sentences for vehicular invasion and attempted armed robbery, and reduce his sentence for escape to 7 years.

¶ 133   Reversed in part, affirmed in part, and modified in part.

¶ 134   JUSTICE PALMER, specially concurring in part and dissenting in part:

¶ 135         A. Shackling During Jury Selection – Special Concurrence

¶ 136   I agree with the majority that the trial court should have conducted a *Boose* analysis, but that any error in that regard was harmless.  I write separately on this issue to additionally point out that the policy considerations underlying the *Boose* decision and its progeny do not apply with equal force here. At the core of these cases is the recognition that unnecessary restraint runs afoul of the presumption of innocence and demeans both the defendant and the proceedings. See *Allen*, 222 Ill. 2d at 368 (quoting *In re Staley*, 67 Ill. 2d 33, 37 (1977)). This case however is unique, as the defendant here did not enjoy the presumption of innocence with regard to the charge of first degree murder. He had already been convicted of that charge and the jury in this case was so informed. It cannot be said therefore that the limited period of shackling he endured deprived him of a presumption of innocence, as he no longer enjoyed that presumption. Nor can it reasonably be argued that it demeaned the defendant or the proceedings, as he was a convicted murderer who also admitted that he attempted to escape from custody.  Based on these policy considerations as well as all the other reasons set forth in the majority opinion, I agree that the court's failure to conduct a *Boose* analysis was harmless error.

¶ 137         B. Aggravated Vehicular Hijacking – Dissent

¶ 138   The majority concludes that the defendant's conduct did not constitute aggravated vehicular hijacking because even though the defendant commandeered the bus at knifepoint, he did not literally "take" the vehicle away from the bus driver by dispossessing him of the vehicle.

In other words, as the defendant did not throw the driver off the bus but rather forced the driver to drive him some distance at knifepoint, this was not a hijacking. In coming to this conclusion the majority relies on a prior precedent from this district, *McCarter*, which in turn relied on our supreme court's decision in *Strickland*, interpreting the word "takes" in our robbery statute, as well as several time-honored rules of statutory construction. Most respectfully, I cannot concur in this result, as I do not believe that it is mandated by *Strickland*, the legislative history, or rules of statutory construction. The majority's narrow interpretation of the word "takes" here is in sharp contrast to the much broader meaning found in every federal circuit case and every state court case, save Indiana's, that my research has disclosed in which the courts considered almost identical language. I cannot accept the conclusion that the legislature meant Illinois to be an outlier on this issue. The majority's decision to reject the most often accepted interpretation of the word "takes" in this context, as meaning to deprive one of control, violates the rule of statutory construction that we must presume the legislature did not intend an absurd result. I do not believe this to be the true intent of our legislature.

¶ 139    To sustain defendant's aggravated vehicular hijacking conviction, the State was required to show that he committed vehicular hijacking while armed with a dangerous weapon other than a firearm. 720 ILCS 5/18-4(a)(3) (West 2006). A person commits vehicular hijacking when he takes a motor vehicle from the person or immediate presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-3(a) (West 2006). In arguing that the undisputed facts of his case did not amount to vehicular hijacking, defendant has presented a matter of statutory construction; accordingly, our review is *de novo*. *People v. Brown*, 2013 IL 114196, ¶ 35.

¶ 140    In interpreting a statute, our primary objective is to ascertain and give effect to the legislature's intent. *People v. Baskerville*, 2012 IL 111056, ¶ 18. The best indication of the legislature's intent is the language of the statute, given its plain and ordinary meaning. *People v. Gaytan*, 2015 IL 116223, ¶ 23. In addition, we "may consider the purpose and necessity for the law as well as the consequences that would result from construing the statute one way or the other." *Id.* In construing statutory language, we presume the legislature "did not intend absurdity, inconvenience, or injustice." *Brown*, 2013 IL 114196, ¶ 36. We also give the language the fullest, rather than the narrowest, meaning possible. *People v. Simpson*, 2015 IL 116512, ¶ 30.

¶ 141    In *McCarter*, the defendant was convicted of aggravated vehicular hijacking based on evidence that he and his brother kidnapped a victim from the victim's driveway by entering the victim's car, armed, while the victim sat in the driver's seat. *McCarter*, 2011 IL App (1st) 092864, ¶ 78. Later, the victim was discovered in his burned out car, still behind the wheel. *Id.* On appeal, the defendant argued the State failed to establish he "took" the victim's car within the meaning of the vehicular hijacking statute. *Id.* ¶ 71. Specifically, he asserted that to "take" a vehicle, he had to physically remove or dispossess the owner from the owner's car. *Id.* ¶ 72. In considering the defendant's argument, our court noted that no published decision had been issued as to whether a defendant could "take" a vehicle, within the meaning of the vehicular hijacking statute, by forcing the victim to drive his car to another location. *Id.* ¶ 74. Accordingly, we looked to the supreme court's decision in *Strickland*, 154 Ill. 2d at 525, in which it considered the "taking" element of the robbery statute (citing Ill. Rev. Stat. 1985, ch. 38, ¶ 18-1). *McCarter*, 2011 IL App (1st) 092864, ¶¶ 75-76.

¶ 142    In *Strickland*, the defendant and his brother ordered a man at gunpoint to drive them to California. *Strickland*, 154 Ill. 2d at 499. The defendant and his brother then got into the backseat

of the victim's car, and the victim drove them to the downtown area of Chicago. *Id.* Eventually,

the defendant and his brother exited the car and ran away. *Id.* at 500. On appeal, the defendant

argued no evidence was presented that he took the vehicle from the victim because the victim

remained in operation of the car throughout the time the defendant and his brother were present.

*Id.* at 525. In response, the State argued the defendant and his brother effectively controlled the

use of the victim's vehicle such that they were in constructive possession of the vehicle. *Id.*

¶ 143    The supreme court agreed with the defendant that the evidence was insufficient to sustain

his armed robbery conviction, noting that the offense of robbery was " 'complete when force or

threat of force causes the victim to part with possession or custody of property against his will.' "

*Id.* at 526 (quoting *People v. Smith*, 78 Ill. 2d 298, 303 (1980)). The *Strickland* court reasoned

that no evidence was presented that the victim's car was ever taken from him. *Id*. It noted that

although the defendant and his brother's actions "certainly denied [the victim] a large measure of

control over his vehicle," the defendant and his brother never removed the vehicle from the

victim's actual possession. *Id.* Thus, the supreme court reversed the defendant's armed robbery

conviction. *Id.*

¶ 144    In reviewing the *Strickland* decision, the *McCarter* court noted that the supreme court

had implicitly rejected the State's argument that "taking control over the victim's car in his

presence" was sufficient to effectuate a "taking," as the supreme court gave no weight to the

defendant's actions that denied the victim a large amount of control over his car. *McCarter*, 2011

IL App (1st) 092864*, ¶ 78. Because, as in *Strickland*, no evidence was presented that the victim

was ever dispossessed of his car, the *McCarter* court stated that it was "compelled to conclude

that the State failed to establish the taking element." *Id.* ¶ 79. Justice Gordon dissented due to the

majority's failure to consider whether burning out the vehicle deprived the owner or his successor in interest of possession or custody of the vehicle. *Id.* ¶ 120 (Gordon, J., dissenting).

¶ 145   The State contends that the *McCarter* court should not have relied exclusively on *Strickland*, which dealt only with the armed robbery statute. The State posits that the decision in *Strickland* was driven in large part by the historical and common law roots of the offense of armed robbery, which included the understanding that the completion of armed robbery required the removal of an item from the victim. According to the State, the vehicular hijacking statute is not beholden to such historical reasoning, given that it was created in 1993. See Pub. Act 88-351, § 5 (eff. Aug. 13, 1993) (creating the offenses of vehicular hijacking and aggravated vehicular hijacking). The State contends the legislature's decision to carve the taking of cars out of the robbery statute and create the vehicular hijacking statute shows it intended vehicular hijacking to be analyzed on its own terms, particularly in light of the fact that vehicles are different than other objects "taken." In sum, the State argues a "hijacking" should not require the physical dispossession of a victim from his vehicle.

¶ 146   In interpreting the federal carjacking statute, The Ninth Circuit recognized that interpreting the "taking" element as requiring the physical relinquishment of a vehicle would be unduly restrictive. See *United States v. DeLaCorte*, 113 F.3d 154, 156 (9th Cir. 1997). Similar to Illinois' hijacking statute, the federal carjacking statute applies when a defendant "takes a motor vehicle *** from the person or presence of another by force and violence or by intimidation, or attempts to do so." 18 U.S.C. § 2119 (2006). In *DeLaCorte*, the defendant pointed a gun at the victim, entered the passenger side of the victim's truck with his companion, and ordered the victim to drive to a specific location. *DeLaCorte*, 113 F.3d at 155. The Ninth Circuit concluded the defendant "took" the victim's truck even though the victim was never forced to leave it. *Id.* at

156. The court reasoned that interpreting a "taking" as requiring the physical relinquishment of a vehicle ignored that a defendant could take control of a vehicle from its owner even though the victim remained in the car and continued to drive it. *Id.* The court further reasoned that the crucial elements of the carjacking statute were "force and violence" and "intimidation," and a victim forced to remain in the car with his assailant, subject to continuing threats and possible violence, often faced greater intimidation and threat of violence than a victim who was immediately released. (Internal quotation marks omitted.) *Id.* Thus, the court concluded the carjacking statute did not require a showing that the victim was forced out of his vehicle. *Id.*; see also *United States v. Gurule*, 461 F.3d 1238, 1243-44 (10th Cir. 2006) (the evidence was sufficient to satisfy the "taking" element of the carjacking statute, despite the defendant's contention that his motive in acquiring possession or control of the vehicle was to receive a "ride," as the defendant's subjective motive was irrelevant and the evidence showed he entered the victim's home and forced the victim at knife point and repeated threats to drive him to a particular location). In addressing defendants' arguments relating to other components of the federal carjacking statute, other circuit courts have likewise affirmed the defendants' convictions where the victims were not in the driver's seat but remained somewhere in the car. See, *e.g.*, *United States v. Castro-Davis*, 612 F.3d 53, 57, 61-62 (1st Cir. 2010) (the victim was transported in the backseat of his car); *United States v. Moore*, 73 F.3d 666, 669 (6th Cir. 1996) (a cab driver was forced out of the cab and into the trunk at gunpoint). The majority acknowledges the holdings of these cases but contrasts them with *Strickland*. However, again, as the State points out, there is substantial federal precedent on carjacking, and *Strickland* is an armed robbery case. The Illinois Supreme Court has not spoken on this issue in this context while these cases have specifically done so.

¶ 147    Several state courts have also recognized that to "take" or "obtain" a vehicle under similar state statutes, a defendant need not remove the victim from the car. See *Williams v. State*, 990 So. 2d 1122, 1123 (Fla. Dist. Ct. App. 2008) (affirming the defendant's conviction for carjacking, which prohibits the taking of a motor vehicle from the person or custody of another, where he jumped into two victims' vehicles and ordered them to drive; a defendant "need not be in physical control of the vehicle" but instead must merely obtain control over the driver through force or violence, threats, or placing the driver in fear); *People v. Duran*, 106 Cal. Rptr. 2d 812, 816 (Cal. Ct. App. 2001) (a "taking" occurred, even though the victims remained in the car, when the defendant imposed his dominion and control over the car by ordering one victim to drive at gunpoint); *Bruce v. State*, 555 S.E.2d 819, 822-23 (Ga. Ct. App. 2001) (affirming the defendant's conviction for hijacking a motor vehicle where he ordered a cab driver to drive him at knifepoint; the concept of "obtaining" a motor vehicle encompassed acquiring control of the vehicle regardless of whether the victim remained inside the vehicle); *People v. Green*, 580 N.W.2d 444, 450 (Mich. Ct. App. 1998) (a victim need not be physically separated from a vehicle for a defendant to "take" the victim's car). In *Winstead v. United States*, 809 A.2d 607, 609, 611 (D.C. 2002), the District of Columbia Court of Appeals affirmed the defendant's conviction for carjacking, concluding the defendant took "immediate actual possession" of the victim's car when, after ordering the victim to get into her car, the defendant ordered her to drive at gunpoint. *Id.* at 611. The *Winstead* court recognized that, "[w]hile [the victim] remained at the wheel, it was [the defendant] who directed her movements and usurped actual physical control of the vehicle. It was no less a carjacking because [the defendant] took his victim along with the car." *Id.*; but see *Burton v. State*, 706 N.E.2d 568, 569 (Ind. Ct. App. 1999) (Concluding that carjacking and kidnapping were distinct offenses, as the carjacking statute "specifically

contemplates that the person who takes the vehicle leaves the person from whom the vehicle is taken at the scene. If the occupant remains in the vehicle being taken, there is no crime of carjacking.").[5]

¶ 148    While not binding on our court, "comparable court decisions of other jurisdictions are persuasive authority and entitled to respect." (Internal quotation marks omitted.) *Andrews v. Gonzalez*, 2014 IL App (1st) 140342, ¶ 23. Here, I find the cases holding that a defendant need not remove his victim from the car to be more persuasive than our decision in *McCarter*. As the *McCarter* court recognized, the vehicular hijacking statute is written in the same way that the armed robbery statute is written. However, the physical characteristics of a car make it different than other objects that are taken in a robbery in that a defendant can use a car for his own purposes by merely taking control of the car from the victim rather than taking the actual car away. Furthermore, as the *DeLaCorte* court recognized, in some instances, a victim forced to drive a defendant around at gunpoint will suffer more prolonged fear and danger than a victim removed from his car after only a brief interaction with a defendant. However, if vehicular hijacking required the dispossession of a victim from his car, then a defendant who removed his victim from the car before driving away would be guilty of vehicular hijacking but a defendant who forced his victim to remain in the driver's seat would not. Viewed another way, if vehicular hijacking applied only when a victim was forced out of the driver's seat, a defendant would have

---

[5] I note that Michigan's hijacking statute has been modified since the decision in *Green* and Indiana's hijacking statute has been repealed since the decision in *Burton*. See Ind. Code Ann. § 35-42-5-2 (West 2014); Mich. Comp. Laws Ann. § 750.529a (West 2014). However, to the extent that *Green* and *Burton* considered language similar to our statutory language, I find they continue to provide guidance regarding the meaning we should ascribe to our statute.

the incentive to force his victim to remain in the driver's seat rather than remove the victim from the car. This cannot have been the legislature's intent. See *Brown*, 2013 IL 114196, ¶ 36 (when interpreting statutory language, we presume the legislature did not intend absurdity or injustice). Moreover, a defendant who forces his victim to drive his vehicle, under the threat or use of force, can cause just as much danger to others on the road as a defendant who actually drives the car himself.

¶ 149   In addition, I find it significant that in removing the taking of vehicles from the robbery statute, the legislature elected to call the offense "vehicular hijacking" instead of, for example, "robbery of a vehicle." See *Alvarez v. Pappas*, 229 Ill. 2d 217, 230-31 (2008) (a statute's title may provide guidance as to a statutory term's meaning if the term is ambiguous). "Hijack" is defined, in relevant part, as "[t]o commandeer (a vehicle or airplane), esp. at gunpoint." Black's Law Dictionary 735 (7th ed. 1999); see also Merriam-Webster's Collegiate Dictionary 548 (10th ed. 1995) (defining "hijack" as, among other things, "to steal by stopping a vehicle on the highway" and "to commandeer (a flying airplane) esp. by coercing the pilot at gunpoint"). Thus, the plain and ordinary meaning of the word "hijack" does not include a requirement that a vehicle be taken away from the victim. Rather, the ordinary meaning of "hijack" includes an understanding that a defendant can "hijack" a vehicle by simply obtaining control of it. It states the obvious that one who commandeers an airplane in midflight is guilty of hijacking even though he has not forced the occupants to leave the plane in midair.

¶ 150   In support of their respective positions, both defendant and the State rely on portions of the General Assembly debates concerning the vehicular hijacking statute. See *Simpson*, 2015 IL 116512, ¶ 30 (if a statute is ambiguous, *i.e.*, subject to two or more reasonable interpretations, we may consider other sources, such as the legislative history, to determine the legislature's intent).

It must be noted that the word "taking" in this context is obviously ambiguous as there are several opinions throughout the country and the federal system that ascribe different meanings to the word in this context. The legislative history makes abundantly clear that the legislature intended the vehicular hijacking statute to apply when a victim is removed from his car. Yet, the debates do not warrant the conclusion that removing a victim from a car is the *only* way in which a defendant can commit vehicular hijacking. To construe the statute as requiring the defendant to dispossess the victim of his car would have the effect of weakening and narrowing the scope of the statute, despite the legislature's clear concern with the danger and havoc that vehicular hijacking causes and its desire to send a strong message to would-be hijackers.

¶ 151   It is clear from the debates that our legislature was responding to a serious violent threat that had appeared as "a new genre of crime" and was on the rise.  The legislature clearly intended this legislation to be a strong response to this dangerous trend. It does not follow therefore, that we should take so narrow an interpretation of the statute when it is clear that the legislature intended to enact a strong response to this danger. In fact, I find it most notable that in discussing House Bill 35, Representative Novak described the proposal as being, "stronger than the one that we have on the federal level because the federal carjacking Bill only applies if the defendant was armed with a firearm." 88th Ill. Gen. Assem., House Proceedings, April 20, 1993, at 164 (statements of Representative Novak).While Representative Novak was referring to the firearm component, I find it disconcerting that the legislator was claiming that Illinois' legislation was stronger than the federal response and yet today the majority is making it weaker than its federal counterpart by way of interpreting the very same language, "takes."

¶ 152   The majority attempts to distinguish the federal hijacking statute from ours by noting that it includes language applying to situations "in which a defendant merely attempts to take a motor

vehicle." *Supra* ¶ 72. The majority characterizes this as a glaring difference. I find that this attempt to distinguish these statutes fails for at least two reasons. First, our legislative scheme separately provides for criminal responsibility for the inchoate crime of attempt (720 ILCS 5/8-4(a) (West 2006)) ("A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense.") As a result, in Illinois, choate crimes, such as vehicular hijacking, can also be attempted. The only difference is that the federal scheme provides for this in the same paragraph. As a result, I find the contention that the federal statute is broader because of this attempt language to be without basis. Second, and most importantly, the fact that the federal statute includes attempt language is irrelevant for this discussion. None of the federal circuit cases cited above relied on attempt language in their rulings, rather they interpreted the word "takes," which appears in both statutes, in its broadest sense to include the deprivation of control. These cases are in direct conflict to *McCarter*, this conflict cannot be distinguished away, and we should meet the conflict head-on. Tellingly, at oral argument, when asked about the attempt language in the federal statute and whether that is a distinguishing factor, both defendant's own attorney, the assistant State Appellate Defender, and the assistant State's Attorney agreed that it was irrelevant for this discussion. Specifically, defendant's attorney rejected the notion that this crime could be characterized as an attempt and agreed that the federal attempt language did not enter into this calculation. Similarly, the prosecutor stated the attempt language in the federal statute is "a distinction without a relevant difference in this case" and that this language, as well as other additional language therein, were "not really relevant distinctions for the questions before this court." I completely agree with both attorneys. This case has nothing to do with the crime of attempt. The cases I have cited do not refer to any attempt language and neither does *McCarter*.

Their holdings only concern the actual taking of a motor vehicle, not the attempt to do so. They are in conflict with our *McCarter* decision. We should resolve the conflict and not be led down the blind alley of attempt.

¶ 153   One last point on the rule of lenity. The majority briefly refers to the rule of lenity and argues that it constrains us to interpret the word "takes" here in such a way as to favor the defendant. However, our supreme court has repeatedly stated "that the rule of lenity must not be stretched so far or applied so rigidly as to defeat the legislature's intent." *People v. Gutman*, 2011 IL 110338, ¶ 43. In *Gutman*, our supreme court cited to the United States Supreme Court's explanation of how the rule of lenity is to be applied as follows.

" 'Finally, petitioners and the dissent invoke the "rule of lenity." The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree. Cf. *Smith*, 508 U.S., at 239 ("The mere possibility of articulating a narrower construction ... does not by itself make the rule of lenity applicable"). " 'The rule of lenity applies only if, "after seizing everything from which aid can be derived," ... we can make "no more than a guess as to what Congress intended." ' " *United States v. Wells,* 519 U.S. 482, 499 (1997) (quoting *Reno v. Koray,* 515 U.S. 50, 65 (1995), in turn quoting *Smith, supra,* at 239, and *Ladner v. United States,* 358 U.S. 169, 178 (1958)). To invoke the rule, we must conclude that there is a " ' "grievous ambiguity or uncertainty" ' " in the statute." *Staples v. United States,* 511 U.S. 600, 619, n.17 (1994) (quoting *Chapman v. United States,* 500 U.S. 453, 463 (1991)). Certainly, our decision today is based on much more than a "guess as to what Congress intended," and there is no "grievous ambiguity" here. The problem

of statutory interpretation in these cases is indeed no different from that in many of the criminal cases that confront us. Yet, this Court has never held that the rule of lenity automatically permits a defendant to win.' *Muscarello v. United States,* 524 U.S. 125, 138-39 (1998).

See also *Santos,* 553 U.S. at 548, 128 S.Ct. 2020 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.) ('the rule of lenity does not require us to put aside the usual tools of statutory interpretation or to adopt the narrowest possible dictionary definition of the terms in a criminal statute')."*Id.*

¶ 154   In applying these lessons from the United States Supreme Court as well as our own supreme court, I cannot find that our statute contains a "grievous ambiguity or uncertainty," especially in light of the fact that so many courts have had no trouble giving similar statutes a broad interpretation. Further, in applying the rule of lenity, we should not put aside the rule of statutory construction that warns us of achieving an absurd result. We are also not required to adopt the narrowest possible dictionary definition of the terms in a criminal statute, especially where as here, the word hijacking is ordinarily defined as the commandeering of a vehicle.

¶ 155   In coming to the conclusion that the majority's decision leads to an absurd legislative result, I have noted that it makes Illinois an outlier on this issue.  Additionally, as noted above, it is appropriate to consider the consequences that would result from construing the statute one way or the other. See *Gaytan*, 2015 IL 116223, ¶ 23. Interpreting the statute broadly would put Illinois in line with most jurisdictions, would effectuate the legislature's desire to enact a strong response to a growing problem, and accept the common dictionary definition of hijacking. On the other hand, interpreting the statute as narrowly as defendant and the majority suggests could lead to many absurd scenarios. Suppose a similarly escaping felon suddenly commandeers a

shuttle bus at knifepoint and forces the driver to head north to Wisconsin. Throughout the long drive north the driver's life is in constant danger. However, just before the Wisconsin border, say at Russell Road, the offender tells the driver to stop and he jumps off the bus. At this point, under the majority's strict interpretation of the word "takes," the offender has not committed aggravated vehicular hijacking.  This is so even though the offender was in complete control of the bus from the moment he entered it. If however, the offender allowed the bus to cross the state line into Wisconsin, then he would have committed federal carjacking. Lastly, if the offender had put the driver off the bus at the outset, and driven it away himself, he would have committed the more serious offense of aggravated vehicular hijacking, even though the bus driver was subjected to far less danger. I cannot agree that this can be interpreted to be our legislature's intent.

¶ 156   In sum, although vehicular hijacking is defined in the same manner that robbery is defined, I agree with the State that the legislature intended vehicular hijacking to be interpreted on its own terms, particularly given that vehicles are different than objects normally taken during a robbery. For the reasons stated, I would thus respectfully depart from our holding in *McCarter* and conclude that a defendant can "take" a vehicle even if he does not dispossess the victim of the vehicle. As to our supreme court's decision in *Strickland*, I acknowledge that the legislature utilized the same "taking" language as was in issue there. I further acknowledge the rule of statutory construction that we are to presume the legislature was aware of how that language has been construed in the courts. See *supra* ¶ 67. However, I first note that *Strickland* was interpreting the language of our robbery statute and that the vehicular hijacking statute did not yet exist. Further, I find the State's argument persuasive that the legislature saw fit to subsequently enact a separate and distinct offense, entitled vehicular hijacking, dealing only with vehicles and that it should be interpreted on its own terms. In that regard, I also find persuasive

the abundant federal precedent that recognizes that a vehicle is uniquely different than other forms of property that could be taken in a robbery. Lastly, I find that the narrow interpretation of the statute utilized by the majority produces an absurd legislative result.

¶ 157   In this case, Rimmer testified that defendant held an object in front of his face and threatened to stab him in the neck if he did not drive, causing him to drive the bus some distance. Under these circumstances, defendant obtained control over Rimmer's vehicle; thus, I would find the evidence was sufficient to establish defendant "took" Rimmer's vehicle. Accordingly, I would affirm defendant's conviction for aggravated vehicular hijacking.

¶ 158   I concur with the remainder of the majority's decision that I have not commented on, except that in light of my position on the hijacking charge, I would find that the vehicular invasion count should be merged.